[No. 20614.  *En Banc.*  July 28, 1927.]

## ·THE ·STATE OF WASHINGTON, *Respondent*, v. WALLACE· C. GAINES, *Appellant.*[1]

[1] CRIMINAL LAW (221)— TRIAL — RIGHT OF DEFENDANT TO INTERVIEW WITNESS—DISCRETION OF COURT.  It is not an· abuse of discretion ·requiring a new· trial, to refuse to permit defendant's . counsel to interview a· witness. held by the· state as a material witness· in a murder case; where the damaging and material part of his evidence was known two weeks before the trial, having been substantially. stated by ·the witness. in an interview when the accused and his attorney were present.                :

[2] SAME ، (110)—EVIDENCE—OTHER, OFFENSES—TO PROVE MOTIVE—ADMISSIBILITY.  .In a. prosecution for the murder of accused's daughter, it is not error to allow· the state to prove incestuous relations between accused and his daughter, to· show motive, where it appears that they had frequent quarrels, and that the daughter was about to put an end to the relations and was leaving him, and that accused opposed a separation and followed her at the time of the crime.

[3] ˙CRIMINAL LAW (134)—DECLARATIONS BY ACCUSED.  In a prosecution for murder, it is not error to allow a witness to testify to a statement made by the accused upon denying the incriminating. assertions of. another state's witness, brought into accused's presence at his request for the purpose of ·repeating his· assertions, where it was only cumulative of what such other witness later testified to at the trial.

˙[4] SAME (191)—CONTINUANCE—DISCRETION OF COURT.  It cannot be said that there was an abuse of discretion in refusing a ·continuance ·in a murder case from Saturday morning ·until the following Tuesday, upon allowing the state ·to endorse and use a new witness; where the witness was first known on Thursday, was examined Friday afternoon, and on the state's resting at 9:30 a. m. Saturday, the court granted a continuance until 9:30 a. m. Monday.                            .

[5] SAME  (146)—HOMICIDE  (51) — EVIDENCE — PHOTOGRAPHS — ADMISSIBILITY—MEANS OR INSTRUMENT USED.  In a murder case, a photograph of the head of the deceased, showing a hole in the skull, is not inadmissible because calculated· to prejudice or inflame the minds.of the jury, where it illustrates to the jury the nature and extent of the injuries inflicted.

[1]Reported in 258 Pac. 508.

[6] CONSTITUTIONAL LAW (143-1) — CONSTITUTIONAL GUARANTIES — PUBLIC TRIAL. Const., Art. 1, §§ 10 and 22, guaranteeing the right to a public trial, is not shown to have been violated, where it appears that, at the opening of the trial, the court stated that, excepting members of the bar and court officers, "the general ·public will be excluded," there was some attempt made on the following day to carry out the statement, but thereafter the public were admitted to the extent of the seating capacity of the room, representatives of the press were at all times admitted, and there was no formal order entered or presumption raised that it was carried out.

[7] CRIMINAL LAW (448)—REVIEW—HARMLESS ERROR—ADMISSION OF EVIDENCE. The admission of immaterial evidence as to a trivial instance in a long, actively contested murder trial, is not ground for reversal where the accused was not prejudiced thereby.

[8] HOMICIDE (49)—EVIDENCE—DECLARATIONS OF THIRD PERSON. In a murder trial, evidence of statements made by accused's wife during a quarrel, are competent and material where they show the relations between the accused and his victim.

[9] CRIMINAL LAW (448)—REVIEW—HARMLESS ERROR—ADMISSION OF EVIDENCE. In a murder case, it is not error requiring a reversal to receive in evidence an exhibit which a witness said looked like a part of the skull of the deceased, where it obviously was not prejudicial.

[10] HOMICIDE (49)—EVIDENCE—DECLARATIONS BY DECEASED. In a murder case, it is not inadmissible as a hearsay statement made out of the accused's presence, to permit a witness to testify to a remark made to him by the victim, where the accused then came from another room and indicated that he had heard the remark.

[11] CRIMINAL LAW (244)—INSTRUCTIONS—COMMENT ON EVIDENCE. It is not error to refuse a requested instruction which was argumentative and would have been a comment on the evidence.

[12] SAME (255)—TRIAL—INSTRUCTIONS—COMMENT ON EVIDENCE. It is not unlawful comment upon the evidence of an alibi to instruct the jury as to the manner in which evidence of the alibi should be considered, "as should all of the evidence in the case."

[13] HOMICIDE (77)—PREMEDITATION—EVIDENCE—SUFFICIENCY. In a murder case, it is proper to refuse a requested instruction to the effect that there was no evidence of premeditation, where it appears that the deceased was first choked into insensibility to an extent which could have produced death, and that her assailant then went to a nearby dump, got a rock, and inflicted wounds upon the head.

[14] SAME (75)—EVIDENCE—CORPUS DELICTI—SUFFICIENCY. A conviction of murder of the accused's daughter is sustained by evidence that her assailant resembled accused in personal appearance, that accused was in the vicinity, his car parked nearby, that deceased was well acquainted with her assailant, having made no outcry, that accused's immediate conduct indicated knowledge of some act of violence, that he claimed knowledge of the perpetration before he was accused, that some person had returned to the body and arranged it to indicate a sex crime which had not been committed, blood stains were found· on his clothing, and he made a statement to a close friend which was practically a confession of guilt.

Appeal from a judgment of the superior court for King county, Jones, J., entered September 27, 1926, upon a trial and conviction of murder in the first degree. Affirmed.

*Robert S. Macfarlane* and *John D. Carmody,* for appellant.

*Ewing D. Colvin* and *Ethan Allen Peyser,* for respondent.

MAIN, J.—The defendant was charged by information with the crime of murder in the first degree. The trial resulted in a verdict of guilty as charged and a finding by the jury that the death penalty should be inflicted. Motion for a new trial and in arrest of judgment being made and overruled, judgment was entered upon the verdict, and the defendant appeals.

On the morning of June 17, 1926, the body of Sylvia Gaines, a young woman approximately twenty-one years of age, was found near the north shore of Green Lake in the city of Seattle. Sometime during the previous night, she had been murdered, the attack being first made by choking and then by beating on the head with a rock. Her body was nude with the exception of a sanitary belt and stockings. The doctors testified that the choking would have been sufficient to cause death by strangulation, even though there had been no

beating upon the head with the rock. Some days thereafter, the appellant was arrested and charged with the murder of Sylvia Gaines, who was his daughter.

Sylvia was born in the state of Massachusetts in 1904. In 1909, her father, the appellant, left her and her mother and came to the state of Washington. Sometime thereafter, the father and mother were divorced. For a few months after coming to the state of Washington, the appellant sent money to his then wife. In September, 1925, Sylvia, having graduated from Smith College, came to the state of Washington to visit her father, to whom she was then a practical stranger. They had not seen each other since the year 1909 when the father came to this state. Four or five years prior to this, the appellant had remarried, and he and his wife were residing in a small house in which there was only one bedroom, but there was a couch in the living room. When Sylvia came, she used the couch as a bed and the appellant and his wife occupied the bedroom. The relations of the parties in time became not pleasant, there were frequent quarrels, and the wife, being not satisfied with the situation, during the latter part of November, 1925, attempted suicide. At this time, the appellant and Sylvia were threatening to leave the home and get an apartment.

The evidence offered by the state shows that, from some time in November until the time of the murder of Sylvia, illicit relations had existed between her and the appellant. The gruesome and revolting details surrounding and preceding the commission of the crime will not be set out herein any further than is necessary to an understanding of the questions presented. Further facts will be stated in connection with the particular questions to which they may be pertinent and relevant.

[1] The first question is, whether there was prej-

udicial error in the refusal of the trial court to permit
the appellant's counsel, prior to the trial, to see and
talk with Louis Stern, one of the state's witnesses.
After the information had been filed, the state fur-
nished the appellant a list of the witnesses which were
then known and which were expected to be called to
testify. One of these was Stern. About two weeks
prior to the trial, the appellant made a motion, sup-
ported by affidavit, seeking permission to interview
and talk with this witness. Stern had been arrested
as a material witness, and was then held in custody in
the King county stockade. The request to interview
and talk with the witness was refused. Upon the trial,
Stern was called by the state and gave damaging testi-
mony against the appellant. In part, he testified that,
on the night of June 16, at about 9:30 o'clock, the ap-
pellant came to his house, and he testified that the fol-
lowing occurred:

"He [appellant] said he wanted a drink. He said
that, if what happened to him had happened to me, I
would want a drink too. I said, 'What's the matter?'
He said, 'You know what I have always told you, that
if anyone in my house told me when I should come and
go and when I should drink and how much, why, I
would kill 'em.' I said, 'Why, what's happened, Bob?'
He said, 'Well, that's what's happened.' I said,
'What's the matter?' He said, 'That's what's the mat-
ter.' Then he sat on the bed and held his head in his
hands. He seemed to be looking at something, and
then, again, he seemed to be looking at something else,
and then Charlie Clark and Mrs. Matthauser came in."

Stern lived near the residence of the appellant and
was a close friend and chum. On June 23, after Stern
had been taken into custody, he made substantially the
same statement in the sheriff's office, in the presence
of the appellant and one of his attorneys. It is true
that, at that time, the attorney had just been called into
the case and had had no opportunity for investigation

or preparation. Upon the trial, Stern testified to some other facts of minor importance, but the vital part of the testimony that he gave upon the trial was disclosed in the interview in the sheriff's office on June 23.

In *State v. Storrs,* 112 Wash. 675, 192 Pac. 984, 197 Pac. 17, it is held, so far as here material, (a) that whether a defendant's attorney will be permitted to interview a state's witness, then in custody, is a matter which rests largely in the discretion of the trial court, and (b) that, even though there be a refusal to interview which amounts to an abuse of discretion, this will not be reversible error, unless the defendant is prejudiced thereby. In the recent case of *Atkins v. State,* 155 N. E. (Ohio St.) 189, the supreme court of Ohio approves and substantially adopts, on this question, the majority view of this court in the *Storrs* case.

Assuming, without deciding, that the action of the trial court in refusing permission to interview the witness Stern was an abuse of discretion, yet it does not appear that the appellant was prejudiced thereby. As stated, the vital and damaging part of his testimony had already been disclosed, and it does not appear that the appellant was in any way prejudiced in not being able to meet the other facts of less importance which were testified to by Stern. The witness being known to the appellant and the most vital part of his testimony having been disclosed, the appellant had ample opportunity to inquire into his habits, character and standing.

The cases relied upon by the appellant are upon different facts and are subject to material distinctions. In *State v. Papa,* 32 R. I. 453, 80 Atl. 12, the question arose upon a new trial, where it was claimed that the trial court had committed error in commenting in the instructions to the jury, upon the conduct of the defendant's attorney in interviewing one of the state's

witnesses prior to trial. There was no question there, as here, as to whether the party accused had been prejudiced by being refused opportunity to interview a witness. In the case of *Exleton v. State,* 235 Pac. (Okl. Cr.) 627, it was held that, under the particular facts of that case, the defendant was prejudiced by the refusal of the court to permit the interview of a witness in custody who was an accomplice to the one upon trial. It was there recognized that, ''under other conditions, this denial of the right to interview might not be an abuse of discretion.'' In the case of *State v. Gangner,* 73 Mont. 187, 235 Pac. 703, the question arose upon a motion for a new trial, the defendant claiming newly discovered evidence. A robbery had been committed, and one of the allegd robbers was on trial. One of the others testified for the state, but the third one the state did not call. He was in custody. The defendant sought to interview him, but was denied the privilege. It was discovered, after the trial, that his evidence would be favorable to the defendant. It was held that the defendant was entitled to the benefit of the use of this evidence as newly discovered.

While we do not commend the ruling of the trial court in this case, it does not furnish an error for which a new trial should be orderd.

[2] The second question relates to the admission of the evidence of the relation existing between the appellant and his daughter. It is claimed by the appellant that this evidence should have been rejected, because it tended to prove a collateral crime, that of incest. The state says that the evidence was admissible for the purpose of showing motive. The general rule is that, when the defendant is charged with a particular crime, evidence of a collateral crime is inadmissible. This rule, however, is subject to a number of exceptions, one of which is that evidence of the collateral crime is

proper for the purpose of showing motive. Before
evidence of the collateral crime can be received, there
must be some causal relation or natural connection be-
tween that crime and the one for which the defendant
is being tried. *State v. Hakon,* 21 N. D. 133, 129 N. W.
234; *State v. Beam,* 184 N. C. 730, 115 S. E. 176. Evi-
dence of the existence of a motive, or a lack thereof,
for the commission of any particular crime is often of
much importance in determining whether the defend-
ant committed the crime with which he is charged, and
this is especially true where, as in this case, the state
relies upon circumstantial evidence. *People v. Bowers,*
1 Cal. App. 501, 82 Pac. 553; *People v. Harris,* 136 N. Y.
423, 33 N. E. 65. In the case last cited it is said:

"The argument against the admissibility of the evi-
dence of the witness Latham presents more difficulty,
perhaps, at first glance; but when we consider the im-
portance of showing motive in a case, where the evi-
dence to charge the accused is wholly circumstantial,
the difficulty disappears. It may be remarked, in con-
nection with this evidence from the witnesses Latham
and Oliver, that, while evidence merely to show previ-
ously bad and vicious character is inadmissible against
one on trial for the commission of a criminal offense,
if the depraved acts offered to be shown evidence, or
throw light upon, motive, they become admissible."

In *State v. Spangler,* 92 Wash. 636, 159 Pac. 810, it
was held that, "in cases of marital homicide, the state
has the right to prove ill-treatment or quarrels with
his wife, on the trial of the husband for her murder."
In *Frank v. State,* 141 Ga. 243, 80 S. E. 1016, a young
girl was killed in a pencil factory, on Saturday after-
noon when the factory was not in operation. The evi-
dence showed that she went to the office of the super-
intendent to draw her pay, and no witness testified to
having seen her alive thereafter. The superintendent
of the factory was charged with her murder, and evi-
dence was received, over objection, as to his lascivious

disposition on prior occasions toward other girls in the factory. It was held that evidence of transactions of the accused with women occurring at the same place, not a great while before the homicide, was admissible as throwing light upon the motive of the accused. In *State v. Spadoni*, 137 Wash. 684, 243 Pac. 854, it was held that, in the production of its evidence in homicide cases, the state has a wide latitude. It was there said:

"But, in homicide cases, the state has a wide latitude in the production of evidence. The general rule in this regard is well stated in the following excerpt from Ruling Case Law (Vol. 13, p. 906, par. 211):

" 'When a person is accused of a felonious homicide, it is both the right and the duty of the prosecution to give evidence of all those surrounding facts and circumstances which have any bearing upon the manner of the death, and any tendency to show whether it was natural, accidental, or felonious, and if the latter, whether the deceased was *felo de se,* or died by the hand of another. The jury should be given as complete a picture as possible of all the surroundings; and this, irrespective entirely of any question of subsequently connecting the defendant with the transaction by other proofs. Such evidence is a necessary preliminary to any which shall be offered to connect any particular person with the homicide; and the more full and complete the prosecution make it, the better do they discharge their duty to the public, and if he is innocent, to the defendant also. It is a universal rule of evidence, applicable to homicide cases as well as to other judicial proceedings, that all facts and circumstances upon which reasonable presumption or inference can be founded, as to the truth of the issue or disputed fact, are admissible in evidence. If the fact consist of parts, or is provable by many circumstances, each of which conduces something to the establishment of it, then each part, and each circumstance, is admissible, although the point will not be established until the whole fact is proved.' "

We come now to the question of the evidence offered for the purpose of showing motive in the present case,

and whether it was admissible for that purpose. As
stated above, from some time in November, 1925, until
the time of Sylvia's murder, the relations between her
and the appellant were incestuous. During the even-
ing of November 24, 1925, the appellant registered him-
self, his daughter and his wife at the Arctic Hotel in
Seattle. Two rooms were assigned to them, with a
door between. The appellant sent a note to his wife
asking that she come down to the hotel, which she did
not do. On this evening, the appellant was very much
intoxicated, and, in fact, he was very much given to the
use of intoxicating liquor to excess. Sometime during
the forenoon of the following day, a woman, an em-
ployee of the hotel, entered one of the rooms from the
hallway, but no one was in the bed in that room. She
passed through the bathroom to the other room, and
there saw the appellant and his daughter together in
the same bed. A few days after this, the appellant's
wife attempted to commit suicide. The appellant and
Sylvia, as stated, at this time threatened to leave the
home.

Thereafter, the appellant's wife, suffering from
the wound which she had received, occupied the bed-
room in their home alone, and the appellant, as he
stated to a neighbor, slept upon the couch with Sylvia.
Sometime during the latter part of February, the ap-
pellant's wife went to California, returning two or
three days after Sylvia's murder. During this time,
the evidence tends to show that Sylvia did not use the
couch in the living room as a bed, but that she and the
appellant occupied together the bed in the bedroom. As
time went on, Sylvia, apparently tiring of this relation,
was planning to return to her mother in the state of
Massachusetts. The appellant repeatedly said that, if
she went, he would not be far behind. They repeatedly
quarreled, and the appellant continued to use liquor to

excess. The appellant's wife was returning from California, and he stated that he did not want her to come, that he should have left her before. During this time, except the two days before her death, Sylvia had not been employed, and had been almost constantly in the companionship and under the influence of the appellant. There is some evidence that, after getting the employment at which she worked for two days prior to her death, she intended to remain in Seattle, but move to the home of her uncle, the appellant's brother. In any event, her trunk was packed and she must within a few days, because the wife of the appellant was returning from California, leave the home. The appellant was apparently depressed and irritated over the situation.

On the evening of June 16, when Sylvia returned to the home from her work, she and the appellant, it is a fair inference from the testimony, quarreled. The appellant stated that she left the house in a huff. She left the residence of the appellant at about eight o'clock. Sometime thereafter, the appellant left in his automobile. There is evidence indicating that Sylvia was killed at about nine o'clock on the evening of June 16, and, at this time, the appellant's automobile was parked in the vicinity and that a man answering his description physically was at the scene of the crime. On this evening, the appellant had been drinking, but had not become intoxicated until later in the night.

As stated, the evidence shows that Sylvia was first choked and that death could have been produced by strangulation. It is said that the appellant had no motive to kill his daughter, but it cannot be said to be unreasonable that, after the quarrel, being angry and dissatisfied with the fact that his wife was soon to return from California and that the object of his lust for

a number of months was escaping from his clutches, he pursued his daughter and committed the crime with which he is charged. It makes no difference, in this connection, whether she was leaving appellant's home to return to Massachusetts or to go to the home of her uncle.

In cases of this kind, the prior relations between the deceased and the accused have a direct bearing upon the motive inducing the crime, and the fact that the evidence may tend to prove a collateral crime is no reason why it should not be received. The object of the trial is to arrive at the truth, and all facts which are competent, relevant and material should be made to appear, in order that a just determination of the cause may be had. Under the authorities above cited, we are of the opinion that the court did not err in receiving the evidence of the relations between the appellant and his daughter, even though it did tend to prove a collateral crime.

It is further said that this evidence, as proof of motive, would amount to an inference upon an inference. This is upon the assumption that the incestuous relation between the appellant and his daughter was the first inference and the second was the motive. The answer to this is that it cannot be said that the improper relations existing were shown only by inference. The evidence goes further than that and, if believed by the jury, has a direct tendency to establish the fact.

[3] The third question is, whether the testimony of N. A. Baker, as to a statement made by the witness Stern in the presence of the appellant, was properly received. The appellant was in the sheriff's office, being questioned by the prosecuting attorney. He was told of the statement that Stern had made, which is above set out and is to the effect that the appellant

wanted a drink because of what had just happened. Counsel for the appellant was present and requested that Stern be brought in and be confronted with the appellant. This was done, Stern repeated the statement and the appellant promptly stated, "That's a —— lie." Upon the trial Baker was called and testified as to this occurrence. Later, Stern was called and in his testimony repeated substantially what he had said upon the occasion in question. The case of *State v. McCullum*, 18 Wash. 394, 51 Pac. 1044, much relied upon by the appellant in this connection, is not controlling. There, the defendant was required against his will to listen to an extorted confession by one jointly charged with him in the commission of the crime, but who had been given a separate trial. Here, the statement was made in the presence of the appellant at the suggestion of his counsel and, in addition to this, Stern, upon the trial, testified that the appellant had made the same statement to him on the evening of June 16, at about 9:30 o'clock. Had Stern not been brought into the presence of the appellant for the purpose of having him repeat his statement and had Stern not upon the trial testified to the same thing, a different question would be presented. Under the circumstances attendant upon the making of the statement to which Baker testified, it was not error for the trial court to receive the evidence. It was only cumulative of what Stern later testified to.

[4] The fourth question is, whether the court allowed a sufficient continuance after permitting the endorsement of the name of the witness H. R. Wurster upon the information, near the close of the state's case in chief. The trial began on August 2, 1926. On August 12, which was Thursday, at about noon, the testimony which Wurster would give first came to the attention of the prosecuting attorney. Immediately

upon the opening of court that afternoon, he moved that the name be endorsed, which was resisted by the appellant. The court permitted the endorsement. The witness was called on the following day, late in the afternoon, gave his testimony in chief and was cross-examined. On the next day, which was Saturday, when court convened at 9:30 a. m., the prosecuting attorney announced that the state was ready to rest its case. The court indicated that the appellant would be entitled to a continuance on account of the testimony of Wurster. The appellant moved that the case be continued until the following Tuesday at 9:30 a. m. The court continued the case until the following Monday at 9:30 a. m. It has been repeatedly held by this court that it was not error for the court to permit the endorsement of the name of a witness upon the information, during the course of the trial. The question here, however, is whether, in granting the continuance until the Monday following and refusing to grant it for another day or until Tuesday, the court abused its discretion. Whether a continuance shall be granted, when an additional name or names are endorsed upon an information during the trial of a criminal case and the extent thereof, rests largely in the discretion of the trial court, and this court will not disturb the ruling of that court, unless it appears that the discretion has been abused. *State v. Conner,* 107 Wash. 571, 182 Pac. 602; *State v. Wallace,* 114 Wash. 586, 195 Pac. 993. We cannot say in this case that the court abused its discretion in refusing the continuance for a day, in addition to that which was allowed.

[5] The fifth question is whether the state's Exhibit G-7 was properly admitted in evidence. This exhibit was an enlarged photograph of the head of the deceased. The objections to it are: (a) that it was not necessary in proof of any material fact; (b) was cal-

culated to prejudice and inflame the minds of the jury; and (c) that it was not a correct representation of the matter it was offered to illustrate. Doctor William J. Jones, in testifying, stated that he could better illustrate to the jury the nature and extent of the injuries by the use of the pictures. The exhibit in question shows the injury caused by the blow on the side of the face, the hole in the skull caused by the beating with a rock, and the injury to the neck caused by the choking. We cannot say that it was not necessary in proof of any material fact in the case. The fact, if it be a fact, that it was calculated to prejudice or inflame the minds of the jury would not be a sufficient objection to its admission, if it was otherwise competent. *People v. Balestieri,* 23 Cal. App. 708, 139 Pac. 821; *People v. Saenz,* 50 Cal. App. 382, 195 Pac. 442. This exhibit was less calculated to inflame or prejudice the minds of the jury than were the photographs taken of the nude body of the deceased at the place it was discovered on the shore of Green Lake, which were admitted without objection and, apparently, about which there is no complaint. Before the picture was taken, the hair over the wound on the skull was pushed back in order that the opening therein might be made to more distinctly appear. This appears in the testimony, and that fact does not render the picture objectionable as evidence. As pointed out in *Willis v. State,* 49 Tex. Cr. App. 139, 90 S. W. 1100, "The authorities on this subject [photographs as evidence] are not always reconcilable, some of them going to a greater extent than others." This court has taken a more liberal view with reference to the admitting of photographs in evidence than have some others. In *Kelly v. Spokane,* 83 Wash. 55, 145 Pac. 57, it is said:

"We deem it pertinent, however, to say that the practice of admitting photographs and models in evi-

dence in all proper cases should be encouraged. Such evidence usually clarifies some issue and gives the jury and the court a clearer comprehension of the physical facts than can be obtained from the testimony of witnesses."

In *State v. Fateh-Mohamed,* 76 Wash. 462, 136 Pac. 676, it is said:

"It is contended that the introduction of the photograph of the prosecuting witness, showing the injured condition of his neck, was erroneous. There was oral testimony tending to show that this photograph correctly showed the condition of his neck at the time it was taken, and that such condition was not different from its condition immediately following the alleged assault, except such changes as five or six days' time would ordinarily show. The introduction of photographs under such circumstances is a matter of sound discretion in the trial court. It seems clear to us that such discretion was not abused in this case. 17 Cyc. 416. The following decisions deal with the question of the admissibility of photographs in evidence, and the court's discretion relative thereto, and are in harmony with the conclusion that we here reach: (Citing authorities)."

In *State v. Tyree,* 143 Wash. 313, 255 Pac. 382, it is said:

"The appellant asserts that error was committed in the admission of photographs showing the body of the deceased lying upon the deck of the boat where he met his death. We find no error in the admission of these photographs, as they were sufficiently identified as representing the situation at the time the crime was discovered."

It was not error to receive in evidence Exhibit G-7.

[6] The sixth question is, whether the appellant had a public trial. The trial started on August 2, 1926, and terminated on August 19, 1926. On the 11th day of that month and just before the adjournment of court in the evening, the trial court stated:

"Before adjourning I will state that the atmosphere is pretty unbearable. I know the jury must also feel it. I assume there is a certain part of the members of the bar, who from the standpoint of students, desire to hear the testimony, but with those exceptions, court officers and members of the bar, the general public will be excluded, beginning tomorrow."

It must be admitted that that was an improvident statement to make. Had it been carried out, there would have been in this case a very serious question. Sections 10 and 22 of Art. 1 of the constitution of this state guarantee to everyone accused of crime the right to a public trial. When the motion for a new trial came on for hearing, the respective parties presented a large number of affidavits on this question. The affidavits of the state tend to show that the statement of the court as to the exclusion of the general public was not carried out. The affidavits of the appellant are to the contrary effect and go somewhat into detail as to what was necessary to be done in order to gain permission to enter the court room from the officers at the door or in the corridor. In passing upon the motion for new trial, the trial court made a statement into the record, but this is of little assistance because it proceeds upon the assumption that it would not have been error had the attendance in the court room been regulated as indicated by the statement. After reading, a second time, all the affidavits presented and considering the statement of the court so far as it throws light on the question, we believe the fact to be that, on the day following the making of the statement, there was some attempt to carry it out, but that, after that, the public were admitted to the court room to the extent at least of the seating capacity therein reserved for that purpose. The statement makes no mention of the representatives of the press, but these were at all times present and, even though they were not mentioned, we

cannot think that it ever was the thought of the trial court to exclude them.

It is said, however, that the presumption is that the order of the court, if it can be called an order, was carried out. There was at no time a formal order entered, neither was there a minute entry or a specific direction to any particular officer to see that it was executed, so far as the record discloses. The cases which hold that there is a presumption that the order was carried out, we think, will be found to deal with a formal order entered, an order embodied in the clerk's minutes, or a specific direction to a particular officer. In any event, we think the fact is as already indicated. If the attendance was limited to the reasonable capacity of the court room, without partiality or favoritism, we do not understand that there is any claim that this would have constituted error. If the right of the accused guaranteed by the constitution had been invaded, a presumption of prejudice would arise, even though no actual prejudice existed. We are impressed with the fact that the appellant was not in any manner prejudiced by what occurred. He was represented by counsel who were capable of and who, in fact, did protect his every right throughout the entire trial. Had they believed that what was done in fact was prejudicial to the appellant, they undoubtedly would have made some protest to the court with reference to the situation, even though this was not incumbent upon them in order to preserve the error arising from the violation of a constitutional right, if such right were in fact violated.

The case of *State v. Marsh,* 126 Wash. 142, 217 Pac. 705, bears no relation to this case upon the facts. There, the defendant was charged with contributing to the delinquency of a minor and was tried without a jury in private, as are juvenile delinquents. The question as to whether

" . . . there is power in the trial court, proceeding in the exercise of discretion, to exclude the public or any portion of it during the trial of a criminal case and if so to what extent and under what circumstances it may be done"

was not there involved.

Believing that the statement of the court was not carried out, but that the general public were admitted to the court room to the extent of its seating capacity during the trial, the rights of the appellant, as guaranteed by the constitution of this state and by the 14th amendment to the constitution of the United States, were not invaded.

Entertaining the view of the facts that we do, it is not necessary to review the great number of cases cited in the briefs on the question of what restriction upon the attendance in the court room during the trial will amount to an invasion of the constitutional right of the accused and what will not.

The seventh question has to do with what are called in the appellant's brief "miscellaneous errors". Under this head, a number of matters of minor importance are discussed.

[7] (a) A witness, who lived neighbor to the appellant and his wife, was permitted to testify, over objection, as to what the appellant on one occasion said with reference to his relations with his wife to the effect that he should have left her three years before, "when she fired those shots at me. I had a good way out then." We do not see the materiality of this testimony, but we are of the view that the appellant was not prejudiced thereby. The trial was a long one and was actively contested at all stages. In such a trial, it is almost inevitable that slight errors may creep in from time to time. If judgments are to be reversed because of any small error that may appear in the record, it would put verdicts of juries upon a very in-

secure foundation. It is only prejudicial errors that call for a reversal. In *State v. Hazzard,* 75 Wash. 5, 134 Pac. 514, it is said:

"It is not every error that calls for a reversal of a cause; only those that appear to be prejudicial. In *Davidson Fruit Co. v. Produce Distributors Co.,* 74 Wash. 551, 134 Pac. 510, it is said:

" 'In reviewing a case on appeal, courts have come to be more and more inclined to look to the effect of an alleged error rather than to the fact that an error was committed.'

"The trial of the cause consumed sixteen or seventeen days. In such a case, the jury reaches its verdict, not by reason of any one circumstance appearing during the trial, but by reason of the general impression which the testimony as a whole had upon their minds. It would be unreasonable to hold that a circumstance of this character in a trial consuming the time that this one did could have had any material effect upon the verdict of the jury."

[8] (b) A witness was permitted to testify, over objection, as to what was said in the presence of the appellant at the time Mrs. Gaines attempted to commit suicide. This was to the effect that Sylvia said she could not stand it any longer and was going with her father, and that Mrs. Gaines, on the same occasion, said, "Bob, don't hit me, I will be good to her. Please, Bob, don't hit me". This evidence was competent and material, as it related to the relations of the appellant and his daughter and showed his attitude toward his wife in connection with that relation.

[9] (c) There was introduced in evidence, over objection, an exhibit which Doctor Jones testified looked like the part of the skull that was missing from the right side of Sylvia's head. We see no objection to the admission of this exhibit and, if it be assumed that it should not have been admitted, its admission would not be error, because obviously it could not be prej-

udicial, when considered in connection with all the other evidence in the case.

[10] (d) A witness was permitted to testify, over objection, that, while he was in the home of the appellant a few days before the murder, Sylvia pulled up the sleeves of her dress and showed him marks on her arms that she said her father had made the night before. The objection to this testimony was that it was not made in the presence of the appellant, and was therefore hearsay. The record will hardly sustain the inference that it was not made in the presence of the appellant, because the witness stated that the appellant "then came in from the other room and told her to go into the living room." From this, it would appear that the appellant had heard the remark which had been made.

[11] (e) The appellant requested an instruction on the subject of the testimony of verbal admissions made by the appellant, which was refused. The instruction was properly refused, because it was argumentative and, if given, would have been a comment upon the evidence. The case of *Jones v. Harris,* 122 Wash. 69, 210 Pac. 22, does not support the claim that the instruction should be given. In that case, no instruction of the kind here requested was either given or refused. The question was not there involved. The court was there considering whether evidence of interested witnesses of admissions of the defendant were in themselves sufficient to take the case to the jury upon a vital issue. While discussing this question, the court made certain observations as to the law. It does not follow, however, that those observations would be proper to be embodied in an instruction to the jury. There was no error in the refusal to give the requested instruction.

[12] The eighth question relates to the alibi in-

struction given by the court. This instruction is in substance the same as that given in the case of *State v. Fasick*, 140 Wash. 198, 248 Pac. 384, and it was there held that the giving of the instruction was not error. The particular language, in the instruction in this case, to which objection is made was embodied in the instruction in that case word for word. It is argued, however, that that case should be departed from and the instruction held error. This we are not inclined to do, as we are satisfied with the holding.

[13] The ninth question is whether error was committed in the refusal of the trial court to give the appellant's requested instruction on the matter of deliberation or premeditation. This requested instruction, in part, was to the effect that there was no evidence of premeditation in the case, and that the appellant could not be found guilty of murder in the first degree. As to what would constitute deliberation or premeditation, the jury were properly informed in an instruction given. The requested instruction was properly refused. The evidence shows that the deceased was first choked into insensibility to an extent which could have produced death. A choking, to have this effect, takes some appreciable time. After the deceased was choked into insensibility, her assailant went to a garbage dump nearby, got a rock, returned and inflicted the wounds upon the head. It cannot be held, under the facts and circumstances of this case, that there was no evidence from which the jury had a right to find deliberation or premeditation. It is true that proof of the fact of killing, alone, does not raise a presumption of premeditation or deliberation, but premeditation or deliberation may be inferred from the circumstances of the killing. 30 C. J. 142.

[14] The tenth question is whether the evidence was sufficient to take the case to the jury. We shall

not review the evidence in detail. There was ample evidence to support the conviction, if believed by the jury. The following is a brief summary, in skeleton form, as to the facts which the jury, among others, had a right to find. The assailant was a man that resembled in physical appearance the accused. The appellant, at the time of the murder, was in the vicinity of the place where it was committed. His automobile was parked nearby. The assailant was someone that the deceased was well acquainted with, as there was no scream or outcry, and there were a number of persons sufficiently near that, had a scream or outcry been made, it would have been heard. The conduct of the appellant, during the night following the commission of the crime, was such as to indicate knowledge on his part that some act of violence had happened to his daughter. The home of Sylvia's uncle, the appellant's brother, would be the natural place for her to go, and yet the appellant did not call his brother's home until twelve o'clock at night and after it had been suggested to him by a person with whom he talked. Before the appellant had been accused of the crime, he made statements that indicated that he knew who did it. The evidence shows that, sometime after the killing, some person returned to the body and so arranged it to make it appear that a sex crime had been committed, when, in fact, no such crime had been perpetrated. Some blood stains were subsequently found on appellant's clothing. In addition to this, there is the evidence of the witness which practically amounted to a confession of guilt and also the evidence of motive. The appellant, of course, denied guilt and the testimony on his behalf, in many particulars, conflicted with that of the state. There is no occasion here to review the testimony offered by the appellant, because, if the state's evidence made a question for the jury,

as we have found, then the verdict is controlling as to the facts.

In conclusion we say, after giving this case more than ordinary consideration, that the appellant had a fair trial. He was ably defended. He has been found guilty by the verdict of the jury, which is sustained by evidence which does not leave the question of his guilt in doubt.

The judgment will be affirmed.

All concur.