Murray Lee **KLAVER**, Plaintiff-in-Error,

v.

**STATE** of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

Aug. 29, 1973.

Certiorari Denied by Supreme Court
Dec. 3, 1973.

Robert T. Byrd, III, Cleveland, C. P. Swafford, Dayton, for plaintiff in error.

David M. Pack, Atty. Gen., and John B. Hagler, Jr., Asst. Atty. Gen., Nashville, J. William Pope, Dist. Atty. Gen., Pikeville, for defendant in error.

OPINION

OLIVER, Judge.

Indigent and represented below and here by appointed counsel, Klaver has perfected an appeal in the nature of a writ of error to this Court contesting his Rhea County

Circuit Court conviction of an assault upon his nine-year-old daughter with intent to carnally know her, for which he was sentenced to imprisonment for 10 years in the State Penitentiary.

By his first Assignment of Error the defendant challenges the sufficiency of the evidence, insisting that it preponderates against the verdict and in favor of his innocence. In summary, the material testimony obviously accredited by the jury shows that on the day in question the defendant came home late in the afternoon and went into the bedroom of his little daughters (nine-year-old Mary Leealla and 12-year-old Charlotte), and while they and the other members of his family were eating supper he undressed completely, called Mary Leealla into the room and told her to remove her clothes and get in bed with him where he attempted to have sexual intercourse with her; that she began crying and calling for her mother and ran nude from the bedroom to the kitchen and then fled the house clad only in a towel which she picked up as she ran; that the defendant emerged unclothed from the bedroom and told Charlotte and their 11-year-old brother Rickey (who by looking through the bedroom window saw the defendant and Mary Leealla unclothed on the bed where "He was, he was underneath her. He was on his back going up and down on her stomach," and heard her screaming and yelling for her mother) to go after her and told them he would kill them if they didn't bring her back; that she ran down the mountain from their home and through woods and underbrush and hid in a ditch where the children found her; that when the defendant followed and approached her she ran again and eluded them. While he and the children were near the scene of her disappearance, Mrs. Linda Johnson and Mrs. Susie Wilkey came along in a car. When Mrs. Johnson asked the defendant, who was dressed only in boots and a pair of pants, if a wreck had occurred, he said that his little girl had run away from home.

Mrs. Johnson testified: "I asked him why she ran away, and he said he just got on her and I said, Well, she'll come back and he said, no, said, she's bloody naked. That's the expression he used. And I said, what do you mean, and he said, she don't have any clothes on. And I said, you mean you made her take her clothes off to whip her, and he said, yes. And I said, where's her mother. And he said, she's at home, she's pregnant. I said, don't you think you ought to call the police and he said she'll come out when it gets a little darker." She further testified that later in the evening, between 7:30 and 7:45, she and Mrs. Wilkey and their husbands returned to the scene and Mary Leealla came out of the bushes nude and "shaking and scared" and covering the front of her body with a plastic sack she had found. Mrs. Johnson put her husband's shirt on the child, who then told her "he made me go to bed with my clothes off and put his thing in me." While Mrs. Johnson was talking with Mary Leealla, the police arrived and went and got the defendant who was still nearby, and came back and got Mary Leealla. The Johnsons and Wilkeys took Charlotte and Rickey home, met other officers as they started to their own home and then returned with them to the defendant's home and took Mary Leealla and Charlotte to the Rhea County Hospital, where examination of Mary Leealla by a physician disclosed some bruises on her thighs but no evidence of sexual penetration, no disturbance of the hymen.

Rickey Klaver testified upon cross-examination that before Mary Leealla was found, Charlotte told the Johnsons and Wilkeys everything that happened to Mary Leealla, and that after Mary Leealla was found both she and Charlotte told them what had happened. Mrs. Johnson testified that when she first saw the defendant and Charlotte and Rickey, those children were about 40 feet from the defendant and she asked Charlotte, who was crying, "why did her little sister run away," but she was instructed not to repeat what Charlotte said. Officer Darrell Holmes testified he

and Officer Bruce Ballard were present with the Johnsons and Wilkeys when the child was found, and that she was asked ("Yes, we did.") what had happened to her, and "Using her words, she told us that her father had had her in bed with no clothes on and he was messing around with her," that that was the term she used, "And then she told us she had ran, that she'd got away from him and ran, and was hiding in the woods and planned on waiting till dark and then come on and call the police," and Officer Ballard testified the Johnsons and Wilkeys were with the child when he and Officer Holmes arrived and "She said her dad had got her in bed and pulled all her clothes off and took his clothes off and she had managed to kick him out of bed and run." Daniel Johnson testified that enroute to the hospital, after the child had first been taken home and left a short while with her mother and the other children, "She said her father had her in the bed naked and somehow she managed to get away from him, and she had ran from her house——" The court intervened to stop the statement by saying, in effect, that he would not permit the witness to relate further details. When cross-examined by defense counsel about that statement, Mr. Johnson said, "Well, the little girl did the talking," and "That's the first conversation I heard."

According to Russell Wilkey, when he and his wife and Mr. and Mrs. Johnson returned to the scene of Mary Leealla's disappearance to see whether she had been found, when the defendant was asked where he thought his child could be he said he didn't care. Wilkey also testified he told the defendant officers were on the way and he had better wait for them.

Testifying in his own behalf, the defendant said that he whipped all of his children when they needed a spanking; that his wife "never did get the knack of cooking. She just didn't have the touch for cooking," and that he "stayed on her constantly" about her lack of cleanliness, and "thought she was a little bit off"; that on the day in question before returning home he drank "a few beers" and took "a six carton of beer" home and placed it in the refrigerator; that his family were eating at that time, and he went in the girls' bedroom and sat down in the doorway and pulled off his boots and asked Mary Leealla to bring him a beer; that when she brought the beer she was also carrying her plate and a spoon or fork; that "I got on to her about bringing that plate in there, and she just sorta sulled up, and I told her I was going to spank her, . . . and got a hold of the shoulder of her dress, I was fixing to give her a spanking, you know, and she took off, and when she took off, I had the dress in my hand, and she went through the kitchen and out the back door, and I went into the kitchen. I didn't have my boots on and I told, I told Charlotte and Rickey to catch that kid," and that he and his wife followed looking for her, and that he searched for her until almost dark; that he did not attempt to rape Mary Leealla and did nothing other than grab for her when he started to spank her (because she didn't return the plate to the kitchen as he told her to and he tries to teach the children not to carry plates, he said), and did not get her on the bed or get on top of her or touch her private parts, and that he was not undressed and had only taken off his shirt and boots.

◾ Considered in the light of the familiar and often reiterated rules governing appellate review of Assignments challenging the sufficiency of the evidence in criminal cases, Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Crim.App. 1, 425 S.W.2d 799; Hancock v. State, 1 Tenn.Crim.App. 116, 430 S.W.2d 892; Morelock v. State, 3 Tenn.Crim.App. 292, 460 S.W.2d 861; Chadwick v. State, 1 Tenn.Crim.App. 72, 429 S.W.2d 135; Phillips v. State, 2 Tenn.Crim.App. 609, 455 S.W.2d 637, in our judgment the jury's verdict was fully justified. As the sole and exclusive judges of the credibility of the witnesses and of the weight to be given to their testimony, Gordon v. State,

Tenn.Crim.App., 478 S.W.2d 911; Bailey v. State, Tenn.Crim.App., 479 S.W.2d 829, the jury obviously accredited the testimony of the defendant's children and rejected his. The jury observed all of them upon the witness stand and heard and evaluated their testimony. Upon this record we cannot say that the jury incorrectly weighed and misjudged the evidence. The defendant has failed to carry his burden of demonstrating here that the evidence preponderates against the verdict and in favor of his innocence.

By his second and third Assignments the defendant complains of the admission of statements by Mrs. Linda Johnson and her husband Daniel Johnson, over objection, concerning statements made by Mary Leealla. Mrs. Johnson testified that when the child was found she said her daddy had raped her. When asked whether she questioned the child concerning the meaning of rape, Mrs. Johnson stated:

"Yes, I asked her if she knew what she was talking about, and she said, yes. I said do you know what rape means and she said yes. And I said, you tell me in exact words how you can tell me what he did to you so that I'll make sure before anything, I, you know, say anything, because I didn't want to get anybody into trouble. And she told me, she said he put his thing in me, that's what she said. She said, he made me go to bed with my clothes off and put his thing in me."

Daniel Johnson's testimony as to this child's statement has been noted.

The defendant's argument against admissibility of the testimony of Mr. and Mrs. Johnson concerning statements made by the child are based solely on the proposition that her statements incriminating the defendant were made some four or five hours after the alleged occurrence and for that reason were inadmissible.

Mary Leealla testified they were eating supper when the defendant came home, and Charlotte testified this was about 4:30 or 5:00 o'clock and their brother Rickey said it was about 5:00 or 6:00 o'clock when the defendant came home that day and they were eating supper. The defendant testified that the other members of the family were eating when he got home about 2:00 o'clock and that it was about 3:30 when Mary Leealla ran out of the house and that he looked for her until almost dark. Mrs. Johnson said the child was found about 7:30 or 7:45, after dark, and Deputy Sheriff Ballard said that it was between 7:30 and 8:00 o'clock. Mr. Johnson said the child's statement enroute to the hospital was about half an hour after she was found. Because of illness both the defendant's wife and Mrs. Wilkey were unable to be present at the trial. We believe it more reasonable that the defendant's family were having their evening meal between 5:00 and 6:00 p. m. and that he arrived about that time. The jury evidently did not believe, nor do we, that the family were eating from 2:00 until 3:30 as the defendant indicated.

Quite apart from the rule of *res gestae,* a separate and equally recognized exception to the hearsay evidence rule is that in a prosecution for a sex crime it may be shown by testimony of the prosecutrix or victim or by that of some other witness that she made complaint of the crime shortly after its alleged commission. Under this special exception to the hearsay rule, such a declaration is regarded only as corroborative of the testimony of the victim, and not as original evidence of the crime charged. 2 Wharton's Criminal Evidence (13th Edition), § 313. This special exception to the hearsay rule is recognized in this State. In King v. State, 210 Tenn. 150, 357 S.W.2d 42, our Supreme Court had this to say upon the question in a rape case:

"The defendant complains that the testimony of certain of the witnesses was not admissible because not a part of the res gestae, and further that such testimony

was merely hearsay, depending for its validity upon declarations made by the prosecutrix some several hours after the commission of the alleged offense.

"In the case of Phillips v. State, .28 Tenn. 246, the Court said:

'Where the injured party is examined as a witness, on a trial for rape, her statement of the circumstances, or particulars of the complaint, made recently after the commission of the offense, are admissible as confirmatory of her credibility; so held, where the statements were made to the husband on the morning of the second day after the act.'

"In the Phillips case the prosecutrix stated that the rape occurred on Wednesday at about 12:00 o'clock noon and she did not tell her husband about it until on the following Friday morning. His testimony relating this conversation was objected to but the objection was overruled and the action of the trial court in admitting the testimony was affirmed by this Court.

    *      *      *      *      *      *

"In cases of rape the law does not require that the female be corroborated. However, statements of the circumstances, or particulars of the offense, made by the injured female in such cases when made shortly after the commission of the offense are admissible as confirmatory of her credibility where she is examined as a witness and such statements may be proved by the person to whom they were made, as in this case."

In Wilkerson v. State, 208 Tenn. 666, 674–675, 348 S.W.2d 314, 318, the Court said:

"As far as we know all the courts generally hold that in a case of the kind, assault with intent to ravish, it may be shown by the prosecuting witness, or by other witnesses, that the prosecutrix made complaint of the offense soon after its commission. The reason given for

such, and a logical reason, is that such evidence indicates the truth of the charge and is corroborative of such charge."

See also: Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523; Conboy v. State, 2 Tenn.Crim.App. 535, 455 S.W.2d 605.

Upon consideration of the entire record, including the child's screaming headlong flight in the nude into the woods for no apparent reason except what happened in her bedroom with her father, her nervousness and fright when found after dark, we are of opinion that her statements made to her rescuers concerning the details of her experience with the defendant were made at the first opportunity she had to relate the incident and were properly admitted in evidence as corroborative of her testimony. Her statement enroute to the hospital was merely repetition and was admissible.

██ Also unmeritorious is the Assignment charging the trial court erred in not declaring a mistrial when witness Russell Wilkey testified that he observed the defendant's wife had been beaten up. The court immediately sustained the defense objection to that testimony and instructed the jury to disregard it completely. There is a presumption that the jury does not disregard the court's instructions not to consider inadmissible evidence. O'Brien v. State, 205 Tenn. 405, 326 S.W.2d 759.

Likewise groundless is the defendant's final Assignment that the court erred in overruling his motion to quash the indictment on the ground that he was not advised of his constitutional rights at his preliminary hearing and that counsel was not appointed to represent him in that proceeding.

██ In the first place, the indictment is in no way defective upon its face. The settled law of this State is that a motion to quash an indictment will not lie unless it is invalid upon its face. Shadden v. State, Tenn.Cr.App., 488 S.W.2d 54 and cases therein cited.

But beyond that, notwithstanding it appears in the Bill of Exceptions that the court overruled the motion to quash, no order reflecting that action is shown to have been made and entered of record. When the Minutes of the trial court contain no entry showing any action upon a plea in abatement or a motion to quash an indictment, the established law of this State is that the appellate court cannot review the question raised by such a plea in abatement or motion to quash and is not permitted to look to recitals in the Bill of Exceptions to supply this defect. Jones v. State, 197 Tenn. 667, 277 S.W.2d 371; Gray v. State, 194 Tenn. 234, 241–242, 250 S.W.2d 86.

Let the judgment of the trial court be affirmed.

MITCHELL and RUSSELL, JJ., concur.