**Thornton Lee HANDLEY, Petitioner-Appellant,**

v.

**Jerry PITTS, Sheriff, Respondent-Appellee.**

**No. 78-1479.**

United States Court of Appeals, Sixth Circuit.

June 24, 1980.

William D. Dammarell, Cincinnati, Ohio, (Court appointed—CJA), for Thornton Lee Handley.

William L. Leach, Atty. Gen. of Tenn., Henry E. Hildebrand, III, Asst. Atty. Gen., Robert E. Kendrick, Deputy Atty. Gen., Nashville, Tenn., for respondent-appellee.

Before WEICK, MARTIN and JONES, Circuit Judges.

ORDER

Upon consideration of the briefs, appendix and arguments of counsel, it is ORDERED that the judgment of the district court, 491 F.Supp. 597, denying the application of petitioner-appellant Handley for a writ of habeas corpus be and it here-

by is affirmed for the reasons stated in the Memorandum Opinion of District Judge Frank W. Wilson. We also wish to compliment appointed counsel for Handley for his excellent brief and presentation.

NATHANIEL R. JONES, Circuit Judge, dissenting.

Because the prosecution posed without any supporting evidence highly prejudicial questions which implied prior sexual misconduct by the Defendant, I believe the Defendant's due process right to a fair trial was violated. I must, therefore, respectively dissent from the Court's order.[1]

I.

The victim, Robyn Sue Lee Handley, her four-month old son, her sister Debbie Lee Handley, and the Defendant resided in a trailer at 7502 Noah Reid Road, Chattanooga, Tennessee. This family had resided in the trailer for five days before the victim's body was discovered on the morning of the murder, March 6, 1976.

The State's case consisted of testimony by the neighbors of the Handley family, the police officers who investigated at the scene, the medical examiner, and Debbie Handley, a younger step-daughter of the Defendant. The neighbors of the Handley family testified that they awakened at 2:00 A.M. on the night of the murder. They went to the Defendant's trailer and found the Defendant clad in his underwear, holding the body of the victim, saying, "Oh Sue, who could have done this." It looked like a struggle had taken place, and the interior of the room and the Defendant were covered with blood. The police officers who investigated the crime on the night of the murder testified that after the Defendant was read his rights, he told the police that

he awoke to hear a baby's cry at approximately 2:00 A.M. When he went to the back of the trailer to investigate, someone hit him on the right side of the head. Upon regaining his senses, he discovered his stepdaughter pinned between the bed and the wall and covered with blood.

The police officers testified that they were unable to recreate the assault described by the Defendant. They could find no evidence of footprints in the mud outside the trailer. Two of the officers said they discovered the petitioner clad only in his underwear holding the victim's body. The officers found a wooden candleholder near the bed covered with blood. In the victim's left hand were some head hairs.[2] The police officers also testified that they found scratches on the Defendant on the night of the murder. They pointed out these scratches in pictures of the Defendant attached to the transcript. The policemen further testified that the trailer was equipped with locks that prevented the trailer from being entered from the outside. They found no alcoholic beverages or used liquor containers in the trailer.

The medical examiner, who examined the victim's body the day after the murder, testified that the victim died of blood loss and strangulation, and that her blood alcohol count was .22 mg which would have made her "staggering drunk". He also testified that the victim was sober enough to resist her attacker and that she had *not had sexual relations before her death.*

The key testimony for the State which implicated the Defendant was presented by the victim's younger sister, Debbie. Debbie went to a school for slow learners and was significantly intellectually handicapped. Debbie testified that the Defendant had shared a bed with her sister Robyn the four

1. The Defendant's conviction in a jury trial in the Criminal Court for Hamilton County, Tennessee, was for murder in the first degree of his step-daughter. He was sentenced to 100 years and a day. The Defendant's appeal to the Court of Criminal Appeals of Tennessee was rejected in a unanimous opinion and a writ of certiorari was denied by the Supreme Court of Tennessee in a per curiam memorandum. The

district court dismissed the Defendant's petition for writ of habeas corpus for failure to present any genuine issue of material fact without holding an evidentiary hearing.

2. The FBI's analysis of this hair was inconclusive, finding some similar characteristics and other dissimilar characteristics to the Defendant's hair.

nights preceding her death (and with her, also, the first two nights). She said that the Defendant had instructed her to say that he had shared a bed with his step-daughter only the first two nights, and that, though the lock had been fixed and did function, the lock to the trailer did not work. She testified that the victim did not drink and that the family did not keep liquor in the trailer. The victim, Debbie said, was crying on the morning preceding her death. On the night of the murder Debbie was staying with friends.

At sidebar the prosecution represented to the court that Debbie would testify about sexual advances made by the Defendant toward the victim prior to her death and toward herself afterward. Such testimony, he said, would prove the motive for the crime. The trial court held that testimony about sexual advances made to the victim prior to her death and sexual advances made to Debbie afterward would be admissible.

During the direct examination of Debbie the prosecution asked two questions, to which the trial judge sustained Defendant's objections:

Q: "Debbie, while you were living in the trailer there at Noah Reid Road, did the defendant make any sexual advances toward you?"

Q: "Debbie, when you were living in Red Bank with your step-father and your mother, immediately after this happened, did the defendant make any sexual advances toward you?"

The prosecution asked an additional question which was permitted:

Q: "Let me ask you this question, Debbie. At any time after the death of your sister, Sue, did you hear the Defendant talking to you, and in reference to you, call you Sue, or utter Sue's name in your presence?"

A: "No."

(Tr. 262–63)

After this failed attempt to get incriminating testimony from Debbie, the prosecutor admitted at sidebar: *"All right, Sir. I don't think she knows anything because everything was done outside her presence."* (Tr. 265) (Emphasis added). The defense requested and was denied a mistrial. The defense did not question Debbie Handley. Thus, the defense did not introduce the issue of Defendant's character into the trial.

The Defendant testified that he had not killed his step-daughter. He said that because there was no heat in the trailer he had shared a bed with his two step-daughters the first two nights. He further testified that he had not shared the bed with his step-daughters after that. On the night of the murder he was asleep on a couch in another part of the trailer. He stated that when he heard the baby crying he got up to investigate and was knocked unconscious. When he went into the bedroom of the trailer after regaining consciousness, the Defendant testified, that he found his step-daughter not breathing. He stated he was unsuccessful in giving her mouth to mouth resuscitation. This effort resulted in his body and face being covered with blood.

The defense also solicited the testimony of several other witnesses: a doctor who examined the Defendant the day after the murder said he found no skin traumas on him; the subsequent occupant of the trailer where the murder took place testified that the lock did not work.

After the failure of the court to grant a mistrial, the defense countered the introduction of evidence on the Defendant's character by bringing in character testimony. Several character witnesses testified, including the Defendant's other step-daughter, Sharon Henderson. She testified that her step-father had a good reputation in the community and that shortly after her sister's death when she took him to the doctor she observed the Defendant's torso and found no indications of recent scars.

The defense asked her:

Q: "Okay. Has he ever made any advances toward you that were improper?"

A: "No sir."

(Tr. 341)

The prosecution impeached her testimony of her step-father's good character with a

question about whether she had ever said he was the type of man who could have committed such a crime.

The Defendant argues that he should be granted relief because the State's introduction of evidence on sexual advances violates due process standards of the Fourteenth Amendment, and because the State was permitted to impeach the testimony of Sharon Henderson, another step-daughter of the Defendant.[3]

## II.

Defendant is entitled to a writ of habeas corpus only if the trial did not provide the petitioner with due process of law. A constitutional question is not raised unless the admission of evidence was so gross an error as to impugn *fundamental fairness. Maglaya v. Buchkoe*, 515 F.2d 265 (6th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 282, 46 L.Ed.2d 260 (1975). *United States ex rel. Bibbs v. Twomey*, 506 F.2d 1220, 1223 (7th Cir. 1974), *later app.*, 538 F.2d 151 (7th Cir. 1976), *cert. denied*, 429 U.S. 1102, 97 S.Ct. 1126, 51 L.Ed.2d 551 (1977). The Supreme Court has recently reaffirmed that the responsibility of the federal courts in habeas corpus cases is not perfunctory, even in areas of central concern to the state. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, reh. den., 62 L.Ed.2d 126 (1979). As a defender and interpreter of constitutional protections our duty is to insure that the state provides the fundamental protection of due process of law when it seeks to deprive its citizens of liberty. As stated by the Supreme Court in *Jackson*:

> Although state appellate review undoubtedly will serve in the vast majority of cases to vindicate the due process protection that follows from *Winship*, [397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] the same could also be said of the vast majority of other federal constitutional rights that may be implicated in a state criminal trial. It is the occasional abuse that the federal writ of habeas corpus stands ready to correct.

*id.* at 322, 99 S.Ct. at 2791.

Due process, at a minimum, requires that the state try an individual in an atmosphere free from unnecessarily prejudicial influences that prevent a defendant from receiving fundamental fairness.

The process of determining whether the introduction of evidence of prior bad acts violates due process is a delicate one of balancing interests of a fair trial versus the right of the jury to all relevant information. In general, the prior misconduct of a defendant for which he does not stand indicted is not admissible at trial because of the danger of prejudice. Most state and federal courts permit evidence on prior misconduct to be admitted if it falls within a narrow group of exceptions.[4] One excep-

---

**3.** I agree with the majority's opinion on this issue. After the death of her sister, Sharon Henderson gave an opinion to police officers that the Defendant could have killed her sister. After she was used as a character witness by the Defendant, the prosecution used this prior statement as impeachment. Rule 613 of the *Federal Rules of Evidence* permits the introduction of such prior inconsistent statements to impeach a witness. Sharon Henderson testified as a character witness for the Defendant. Her prior statement which contradicted her present view of the Defendant's character is relevant and admissible. *Brown v. State*, 537 S.W.2d 719 (Tenn.Cr.App.1976)

**4.** *McCormick on Evidence*, § 190, lists 10 exceptions.

(1) To complete the story of the crime by showing its immediate context of happenings near in time or place . . .

(2) To prove the existence of a larger continuing plan, scheme or conspiracy, of which the present crime on trial is a part.
(3) To prove other like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused.
(4) To show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial.
(5) To show by similar acts or incidents, that the act on trial was not inadvertent, accidental, unintentional, or without guilty knowledge.
(6) To establish motive.
(7) To show, by immediate inference, malice, deliberation, ill will or the specific intent required for a particular crime.
(8) To prove identity.
(9) Evidence of criminal acts of accused, constituting admissions by conduct, intended to obstruct justice or avoid punishment for the present crime.

tion is to prove motive. The scope of this general rule necessarily includes questions asked by a prosecutor.[5] In no federal or state case have prosecutors been permitted to question witnesses on prior bad acts without some evidence to prove the underlying insinuations.[6]

The lack of supporting evidence on the prior misconduct distinguishes the cases cited by the State from the present case.[7] As the Fourth Circuit said, in affirming the grant of a petition for habeas corpus relief:

> To allow the prosecutor to ask questions about other alleged crimes, *completely unsupported by fact or evidence*, in the detail which was allowed here, makes a

shambles of a fair trial and deprives the defendant of due process of law. (Emphasis added)

*Watkins v. Foster*, 570 F.2d 501, 505 (4th Cir. 1978) (quoting the district court).

In this case the prior misconduct involved unsupported insinuations of sexual relations with teenage step-daughters. The insinuations so poisoned the well that the Defendant's right to fundamental fairness was violated. When the trial judge permitted the State to continue with the trial after the introduction of evidence of sexual misconduct, it deprived the Defendant of due process.[8]

---

(10) To impeach the accused when he takes the stand as a witness, by proof of his convictions of crime.

The state introduced this evidence on prior bad acts to establish the motive, but it may have been attempting to use it for other purposes permitted by these exceptions.

**5.** *Barnes v. United States*, 365 F.2d 509 (D.C. Cir.1966); *State v. Jacobs*, 382 P.2d 683, 94 Ariz. 211 (1963); *Boggs v. State*, 106 So.2d 263, 268 Ala. 358 (1958); *State v. Hanley*, 18 N.W.2d 315, 219 Minn. 518 (1945). The state cites two cases for the proposition that this rule is not applicable in Tennessee. *McCollum v. State*, 532 S.W.2d 63 (Tenn.Crim.App.1975) and *Klaver v. State*, 503 S.W.2d 946 (Tenn. Crim.App.1973). Neither of these cases is on point. *McCollum* involved a question which included statements not in the record. The Court of Criminal Appeals found this contention too vague to be considered. *Klaver* involved a question to which the trial judge sustained an objection. The trial judge issued a cautionary instruction. The Court of Criminal Appeals said that it would assume that such instructions were not ignored. In this case no instruction was issued. In addition, *Klaver* should be read to mean only that a question to which a defendant objected can be harmless error. It should not mean that such questions do not come under the rule when, as here, they are so prejudicial. Even in *Klaver* the question, though not permitted, had a basis in fact. Here, there is no such basis.

**6.** Cf. *Commonwealth v. Heller*, 369 Pa. 457, 87 A.2d 287 (1952) (Commonwealth permitted to introduce sexual misconduct between defendant and his sister-in-law in order to show motive based on testimony by the sister-in-law) *State v. Gaines*, 144 Wash. 446, 258 P. 508 (1927) *writ dism.*; *Gaines v. Washington*, 277 U.S. 81, 48 S.Ct. 468, 72 L.Ed. 793 (1928) (introduction of incest between father and daughter

permitted to show motive based upon extensive evidence of sexual relations.)

**7.** *Carroll v. State*, 212 Tenn. 464, 370 S.W.2d 523, 529–530 (1963); *Lee v. State*, 194 Tenn. 652, 254 S.W.2d 747, *cert. den., Lee v. State*, 345 U.S. 1003, 73 S.Ct. 1145, 97 L.Ed. 1408, *reh. den.* 346 U.S. 843, 74 S.Ct. 18, 98 L.Ed. 363, *reh. den.* 346 U.S. 918, 74 S.Ct. 276, 98 L.Ed. 413 (1953); *Goedel v. State*, 567 S.W.2d 180, 182–183 (Tenn.Cr.App.1978); *Ellison v. State*, 549 S.W.2d 691, 694–697 (Tenn.Cr.App.1976). However, the cases cited were quite different from the instant case. These cases could more properly be viewed as situations where the evidence was admitted to show a pattern, *Carroll v. State, supra* (evidence of breaking and entering and rape by escaped prisoner who broke into adjacent apartments and raped and attacked inhabitant admitted in trial of second), or as a part of the *res gestae*, *Lee v. State, supra*, (involvement in policy game part of *res gestae* of assault); *Ellison v. State*, supra, (evidence of two rapes were originally *res gestae* of charged murder). In *Goedel* the defendant admitted that a sexual relationship existed between her and a boy. Unlike *Goedel*, in our case there is no admission of sexual relations, and there is no evidence upon which to base an introduction of sexual relations by the prosecution. To the contrary, there is proof that the victim did not have sexual relations prior to her death. There must be some basis in record upon which the prosecutor can introduce such prejudicial material. In this case, there is no basis for admitting such evidence.

**8.** Cf. *United States v. McFadden-Snider*, 552 F.2d 1178 (6th Cir. 1978), (the introduction of sexual misconduct is a violation of due process in federal criminal cases); *Frank v. Mangum*, 287 U.S. 309, 315, 35 S.Ct. 582, 584, 59 L.Ed. 969 (1915) (mob domination of trial created atmosphere which denied fundamental fairness).

Finally, the State's introduction of prior sexual misconduct·was not harmless error. The evidence against the Defendant was entirely circumstantial. The Defendant presented evidence which substantially rebutted the State's evidence. The State has not demonstrated beyond a reasonable doubt that the admission of these insinuations did not contribute to the Defendant's conviction or at least to the jury's finding of premeditation. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Eberhardt v. Bordenkircher*, 605 F.2d 275 (6th Cir. 1979). Since the trial judge did not issue a cautionary instruction, the principles enunciated in *United States v. Smith*, 500 F.2d 293 (6th Cir. 1974) are distinguishable. Because the prosecution introduced this evidence deliberately, the harmless error rule is particularly inappropriate.[9]

Despite the deference due to state evidentiary rulings, I believe in this case the State has violated the due process rights of this Defendant by admitting without proof insinuations of sexual misconduct. Fundamental fairness was impugned to such a degree that a fair trial was denied. The district court erred in denying Defendant's petition for writ of habeas corpus. Accordingly, I would order the district court to grant this petition for habeas corpus.

---

9. The questions are not made harmless because of the testimony of the Defendant and Debbie Handley. This evidence should not be admitted to rebut the alibi testimony of the Defendant because he may not have testified if this evidence had not been admitted. The testimony by Debbie about the Defendant's sleeping in the bed with his step-daughter creates prejudice of a different magnitude than does the additional prejudice caused by the questions posed by the State. It is that additional prejudice which is the crux of this case.