[No. 27283. Department Two. March 16, 1939.]

THE STATE OF WASHINGTON, *Respondent*, v. LAWSON
KAY BARTON, *Appellant*.[1]

*Ray R. Greenwood*, for appellant.

*Ralph E. Purves*, for respondent.

MILLARD, J.—February 26, 1936, the prosecuting attorney for Kitsap county filed an information charging Lawson K. Barton with the crime of murder in the first degree, in that on May 21, 1935, Barton unlawfully and feloniously killed Adolph Sandell by shooting him with a revolver. To the information, the defendant pleaded not guilty and entered a special plea of mental irresponsibility. On the special plea in bar, the defendant was twice adjudged insane and committed to two state hospitals for the insane. Each of those institutions certified the defendant was sane, whereupon the cause was tried to a jury. That trial, which com-

[1]Reported in 88 P. (2d) 385.

menced June 13, 1938, resulted in a verdict of guilty, with a finding that the death penalty should be inflicted. From the judgment and sentence entered accordingly, the defendant appealed.

Grace Sandell, a witness for the prosecution, and her appellant brother, were the only eye-witnesses of the killing. Grace, age forty-four years at the time of the trial and eight years younger than appellant, married Adolph Sandell in 1915 at San Francisco, California, where the Sandells continuously resided thereafter until their change of residence to this state in the spring of 1935. Grace divorced her husband in 1932 or 1933 at his request, but the couple continued to live together as man and wife even after entry of the final decree of divorce, to the date of Sandell's death.

Appellant owned a small tract of land, purchased by him a short time prior to his honorable discharge from the United States Navy, near Port Orchard, on which he lived in a one-room shack. Grace and her husband (the Sandell family consisted of Grace, her divorced husband, and their eleven-year-old daughter) entered into an agreement with appellant to prepare the plans for and pay for the construction on appellant's land of a house, which was to be the home of the three Sandells and appellant. Pursuant to that agreement, Grace Sandell departed from San Francisco and, with her daughter, arrived at appellant's one-room shack April 6, 1935. She brought with her to Port Orchard forty-five hundred (five hundred was left with Adolph Sandell in San Francisco) of the five thousand dollars accumulated by Grace and Adolph Sandell during their married and unmarried life together. One-half of the money Grace had was to be applied to payment of cost of construction of the house mentioned above. The forty-five hundred dollars in cash was kept in

a box in the one-room shack of appellant until a short time after the death of Adolph Sandell, when Grace Sandell deposited it in a financial institution; however, a portion of that cash was used subsequent to Sandell's death to pay for construction of the house which was built shortly following the demise of Sandell.

About eleven p. m., May 8th or 11th, 1935, Adolph Sandell, Grace Sandell's divorced husband, arrived at appellant's one-room shack, where Grace had resided with her daughter since April 6, 1935. Prior to Adolph's arrival, Grace and her daughter occupied a bed, while appellant slept on a couch in that shack. After Adolph's arrival, he, his divorced wife, and their daughter used the bed, and appellant continued to sleep on the couch. On May 21, 1935, ten to thirteen days subsequent to the date of his arrival at the appellant's farm, Adolph Sandell was shot and immediately died as the result of a bullet wound in his head. The body was placed in a stump hole, brush and wood piled thereon and ignited, and the body cremated.

Grace Sandell testified that she saw her brother shoot her divorced husband, but she was in such fear of her brother that she was afraid to inform any person of the tragedy until about January, 1936, when she made a trip to Bremerton to make plans with an attorney to bring an action against her brother by which she expected to gain possession of the real property on which the house was built in accordance with the Sandell's agreement with appellant.

During all the years they had known each other, according to the testimony of state's witness Grace Sandell, the relationship between her and her brother and between her brother and her divorced husband had been friendly; they never quarreled. Over objection of counsel for the appellant, Grace Sandell was permitted to testify that appellant attempted—she

stated this was the only incident of that kind in their lives—six months after Sandell's death to commit the crime of incest with her.

The appellant, when arrested and questioned by the arresting and prosecuting officers, made one alleged confession to the effect that his sister killed her divorced husband and that he assisted in destruction of the body. Some time later, those officers obtained another confession from appellant to the effect that he killed Sandell. Throughout the trial, appellant steadfastly denied his guilt and also denied that he ever made improper advances toward his sister Grace. His testimony was in harmony with that of his sister that his relations with Sandell were friendly, and that he and the Sandells (Grace and her divorced husband) never quarreled. Appellant testified that his sister killed her divorced husband, who, as soon as he arrived at Port Orchard, commenced to quarrel with his divorced wife (Grace Sandell) respecting the money she took with her when she left San Francisco in April, 1935. He further testified that he purchased, at the request of his sister, and with money supplied by her, the revolver (which he delivered to her) that she used in killing Adolph Sandell.

Counsel for appellant contends that prejudicial error was committed by the trial court in admitting, over objection, testimony of Grace Sandell that the appellant attempted to commit the crime of incest with her six months after he killed her divorced husband.

Counsel for the state argues that the evidence was admissible for the purpose of proving the motive of the appellant, and for the purpose of showing the relationship between the sister and brother, each of whom accused the other of committing the murder.

Grace Sandell was the first witness for the state,

which, of course, presented its case first. We quote from the statement of facts as follows:

"Q. At any time after your husband was killed, did Mr. Barton, Lawson Barton, in any way make— MR. GREENWOOD: Just a minute, now! I move the jury be excused. THE COURT: Let him finish the question. MR. GREENWOOD: I would like to have him make his offer to the court. I know what he is going to—I know what this woman's defense is, and what she claims. THE COURT: O. K. well ask the question. Q. Did Lawson Barton at any time after your husband's death make any advances to you? A. Yes. MR. GREENWOOD: No, objected to as irrelevant, incompetent and immaterial, and highly prejudicial. It is only for the purpose of bolstering up her testimony. It cannot have any effect in this case, and the very asking of the question itself is highly prejudicial. MR. PURVES: To show motive, Your Honor. That is what counsel is asking. MR. GREENWOOD: Motive for what? THE COURT: I think so. Overruled. MR. GREENWOOD: Exception. THE COURT: It is admissible. Exception allowed. Q. What kind of advances did Lawson Barton make to you, Mrs. Sandell? A. He wanted me to —to do what was wrong. Q. Just what do you mean? Just tell the jury. A. He wanted to get in bed with me. Q. With you? A. Yes. Q. How often did he make those advances to you? A. He made several times those advances. Q. Did he ever do that? A. No, he didn't. MR. GREENWOOD: It is understood the objection runs to all this testimony? THE COURT: It is understood the objection runs to all this testimony and exception will be allowed. MR. GREENWOOD: And exception preserved to it. Q. Did he ever do it? A. He crawled in bed one night when Edith and I was asleep, and I bawled him out for it. Q. Do you remember how long after Mr. Sandell was dead, how long it was until the first time Mr. Barton made such an advance as that, approximately how long? A. It was not until we moved down in the basement of the place afterwards. Q. You know approximately how long that was? A. About five or six months, I should say. MR. GREENWOOD: Now, I move again, Your Honor, for the sake

of the record, to strike all this testimony, on the additional ground that it could not show any motive, because the time is too remote.  It is simply an effort to blacken the character of the defendant on an extraneous matter, and showing an attempt to commit some other illegal act, and it is certainly immaterial and incompetent for any purpose in this case.  It cannot be for the purpose of establishing any motive so far as this murder is concerned.  The only motive it can establish is the reason why this witness is testifying here, that's all.  THE COURT:  Motion denied.  Exception allowed.  MR. GREENWOOD: Exception."

The testimony of Grace Sandell was offered in chief and violates the rule which forbids the state initially to attack the character of the accused.  It was not possible for the appellant to have accused his sister of committing the murder before the testimony of his sister was given.  That testimony should not have been admitted, as it tended to prove a collateral crime, that of incest.  The general rule is that, upon the trial of a criminal case, evidence of the commission of other independent crimes by the defendant is inadmissible to show either guilt or that the defendant would be likely to commit the crime with which he is charged.  That is to say, evidence of a collateral offense must never be received as substantive evidence of the offense on trial, and

"This rule extends to the proof of the accusation of another crime, as well as to evidence of its actual commission.  Certainly, evidence to show that the accused committed an offense which was in no way connected with the crime charged is not admissible. . . .

"A man cannot be convicted of crime because he is a bad man generally or has committed other crimes for which he has not been punished.  Evidence of other crimes, when offered in chief, violates both the rule of policy which forbids the state initially to attack the character of the accused and the rule of policy that

bad character may not be proved by particular acts."
1 Wharton, Criminal Evidence (11th ed.), 483-487.

The exceptions to the rule that evidence of a collateral crime is inadmissible to show either guilt or that the defendant would be likely to commit the crime for which he is on trial are motive, intent, identity, a common scheme or plan, and absence of accident or mistake. 1 Wharton, Criminal Evidence (11th ed.), 490.

None of the foregoing exceptions, unless it be that of motive, could properly be claimed by the state to justify the admission of the above-quoted testimony of Grace Sandell. Before evidence of the collateral crime can be received for the purpose of showing motive, there must be some causal relation or natural connection between that crime and the one for which the defendant is being tried.

In *State v. Gaines*, 144 Wash. 446, 258 Pac. 508, in which the defendant was charged with the murder of his daughter, evidence of incest between the defendant and his daughter committed prior to the murder was admitted as competent to prove motive. We there stated the general rule that, when the defendant is charged with a particular crime, evidence of a collateral crime is inadmissible. We also stated that the rule was subject to a number of exceptions, one of which is that evidence of the collateral crime is proper for the purpose of showing motive; but that, before evidence of the collateral crime can be received, there must be some causal relation or natural connection between that crime and the one for which the defendant is being tried.

*State v. Gaines, supra,* is distinguishable from the case at bar. In the former, there was no direct evidence of the crime, and motive was a very important element. That case is also distinguishable from the

case at bar in that, in the *Gaines* case, there was a causal relation or natural connection between the crime of incest and the murder for which Gaines was being tried.

In the case at bar, the evidence of attempted incest does not tend to prove the alleged murder, and there is not a natural or obvious connection between the two acts. No element in the crime of murder was absent when the testimony of Grace Sandell was admitted. Her testimony was not necessary to make out the crime of murder, but was evidence calculated to, and doubtless did, inflame the minds of the jurors and so prejudice them against the appellant that they made a finding that the death penalty should be inflicted. Under the evidence, it was not necessary to prove a motive. If the second confession obtained from the appellant is true, that was sufficient to convict him of the crime of murder, and the deliberate shooting by him of Sandell under circumstances showing implied malice was established; hence, proof of motive was not necessary to a conviction.

An apt authority is *Farris v. People,* 129 Ill. 521, 21 N. E. 821, 16 Am. St. 283, 4 L. R. A. 582. In that case, in which the defendant was convicted of the crime of murder, evidence was admitted of a rape upon the wife of the deceased subsequent to the homicide. In holding, in harmony with the general rule, that evidence of a distinct, independent, substantive offense can not be admitted on the trial of the defendant for another and different offense, unless it clearly appears that such evidence tends in some way to prove him guilty of the crime for which he is being tried, the court said,

"The general rule, that evidence of a distinct, substantive offense can not be admitted in support of another offense, is laid down by all the authorities. It is, in fact, but the reiteration of the still more general rule, that in all cases, civil or criminal, the evidence

must be confined to the point in issue, it being said, however, by authors on the criminal law, that in criminal cases the necessity is even stronger than in civil cases of strictly enforcing the rule, for where a prisoner is charged with an offense, it is of the utmost importance to him that the facts laid before the jury should consist exclusively of the transaction which forms the subject of the indictment and matters relating thereto, which, alone, he can be expected to come prepared to answer. 3 Russell on Crimes (5th ed.), 368; 1 Roscoe on Crim. Evidence, (8th ed.) 92.

" 'No fact which, on principles of sound logic, does not sustain or impeach a pertinent hypothesis, is relevant, and no such fact, therefore, unless otherwise provided by some positive prescription of law, should be admitted as evidence on a trial. The reason of this rule is obvious. To admit evidence of such collateral facts would be to oppress the party implicated, by trying him on a case for preparing which he has no notice, and sometimes by prejudicing the jury against him. . . . To sustain the introduction of such facts they must be in some way capable, as will presently be seen more fully, of being brought into a common system with that under trial.' (Wharton on Crim. Evidence, sec. 29.) 'In criminal cases there are peculiar reasons why the test before us should be applied to proof of collateral crimes.' Ibid. sec. 30.

" 'This rule,' says Greenleaf, vol. 1, sec. 52, (not confining it to criminal cases,) 'excludes all evidence of collateral facts, or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute,—and the reason is, that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite prejudice, and mislead them; and, moreover, the adverse party having had no notice of such a course of evidence, is not prepared to rebut it.' . . .

"It is conceded that the mere fact that testimony may tend to prove the commission of other crimes, or to establish collateral facts, does not necessarily render it incompetent, provided it is pertinent to the point in issue, and tends to prove the crime charged; but the general rule is against receiving evidence of another

offense, and no authority can be found to justify its admission, unless it clearly appears that such evidence tends, in some way, to prove the accused guilty of the crime for which he is on trial. Says Agnew, J., in *Shaffner v. Commonwealth,* 72 Pa. St. 65: 'To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor by connection which shows that he who committed the one must have done the other.' And he adds: 'If the evidence be so dubious that the judge does not clearly perceive the connection, the benefit of the doubt should be given to the prisoner, instead of suffering the minds of the jurors to be prejudiced by an independent fact carrying with it no proper evidence of that particular guilt.'    .    .    .

"In this case it must be borne in mind that there is no evidence whatever connecting the two acts, or tending to show wherein the commission of the rape had any bearing upon or tendency to explain the commission of the homicide, and therefore, if it be held that evidence of the one tended to prove the other, it must be upon the ground that there is some natural or obvious connection between the two acts. Did the proof of rape in this case tend to prove defendant guilty of murder? What element in the crime of murder was wanting when this evidence was admitted, or what fact in evidence necessary to make out the crime of murder did it tend to strengthen or corroborate? It seems clear to us that these are questions which puzzle the legal mind, and can only be answered so as to sustain the admissibility of the evidence in question, if at all, by drawing exceedingly fine distinctions.

"To the other question,—was it not evidence calculated to inflame the minds of the jury, and prejudice them against the defendant, rather than prove him guilty of murder,—the answer is obvious. It is insisted that the object was to show a motive, and for that purpose the learned judge held it competent. In the first place, under the facts proved it was not necessary to prove a motive. In cases of doubt as to whether the party charged did the criminal act, proof of motive is

important, and often decisive; but in this case, the State having shown the deliberate shooting, under circumstances showing both express and implied malice, proof of motive was not necessary to a conviction; and while the prosecution doubtless had the right to add that proof by competent evidence, it may well be doubted whether testimony so strongly calculated to prejudice the jury against the defendant should have been admitted, even though it tended to prove a motive, such proof not being necessary to the case.

.    .    .

"It is suggested, and pressed by way of argument, that although the trial court may have erred in allowing this proof, yet, the case being so clearly made out by other evidence and the defense so utterly futile, the error should be held harmless. If the only punishment for the crime of murder in this State was death, the point would be entitled to weight. If it was within the province of the court to assume that the jury would have inflicted the death penalty because the proof of guilt justified it, or if our decision was to affect this case alone, we might hesitate to order a reversal on this theory. The legislature has seen fit to clothe juries with a wide discretion in fixing the punishment to be inflicted upon one convicted of murder. Every defendant on trial for that crime is entitled to the full benefit of the statute. When all else has failed him, he has a right to stand before a jury unprejudiced by incompetent, irrelevant evidence, and appeal to them to spare his life. *It is impossible for us to know what the jury in this case would have done but for the introduction of this incompetent evidence,* much less is it our province to say what they should have done, and no opinion is expressed on that subject. We can only judge of the influence of such testimony upon the minds of the jury by experience and observation common to us all. Here was proof of a distinct felony,— the disgusting and abhorrent facts attendant upon the commission of that most brutal and infamous crime given in detail. No one need be told that from the moment, if the evidence was believed, all feeling of commiseration and mercy toward the defendant must have fled the minds of the jury. There was left for him

no possible escape from the death penalty. But aside from all these considerations, we are required to settle a rule of evidence in criminal trials, not merely with reference to this case, but in consideration of future consequences and other rights, and we can not, from that consideration alone, hesitate to hold that there was such manifest and prejudicial error in the admission of evidence by the trial court in this case as must work a reversal of its judgment." (Italics ours.)

"In cases of doubt [as stated in *Farris v. People, supra*] as to whether the party charged did the criminal act, proof of motive is important, and often decisive;" but where the state has shown the deliberate shooting—there was sufficient evidence if believed by the jury to be true to establish the fact that appellant deliberately shot Sandell—under circumstances showing at least implied malice, proof of motive is not necessary to a conviction. It was prejudicial error for the trial court to admit, over objection, the testimony of Grace Sandell.

The evidence admitted does not come within the exception that evidence of the collateral crime is proper for the purpose of showing motive, in view of the fact that there was not any causal relation or natural connection between the attempted crime of incest and the crime of murder for which the appellant was being tried.

*State v. Richardson,* 197 Wash. 157, 84 P. (2d) 699, and other authorities cited to sustain the position of the state respecting the admissibility of the challenged evidence, are either in harmony with what we have said above or are distinguishable on the facts from the case at bar.

The judgment is reversed, and the cause remanded with direction to the trial court to grant a new trial.

BLAKE, C. J., BEALS, GERAGHTY, and SIMPSON, JJ., concur.