[No. 29534.   Department Two.   July 5, 1945.]

THE STATE OF WASHINGTON, *Respondent*, v. MAXINE
GUERZON, *Appellant*.[1]

*B. Gray Warner* (*Leo J. Peden*, of counsel), for appellant.

*Lloyd Shorett* and *F. M. Reischling*, for respondent.

[1]Reported in 160 P. (2d) 603.

MALLERY, J.—Maxine Guerzon, a white girl, and Alfred B. Moore, a negro, were jointly informed against by the prosecuting attorney of King county on a charge of assault in the first degree alleged to have been committed on one Jesus Raby Crisustomo, a Filipino, in the early morning of August 22, 1944, in King county, Washington. To this information, both defendants entered pleas of not guilty. They were tried and convicted by a jury, and judgment and sentence upon the verdict was pronounced by the court. Maxine Guerzon appeals.

Amore Guerzon, the Filipino husband of appellant, and Crisustomo, who will for convenience hereafter be referred to as J. J. (his nickname), had arrived in Seattle from Alaska, where they had been employed as cannery workers for about three months, on August 20, 1944.

Amore Guerzon and J. J. had been friends for years prior to Guerzon's marriage to Maxine Guerzon, nee Munger, and J. J. had known Maxine since the year 1940. The last time he had seen Maxine Guerzon prior to the night of the assault was in April, 1944, in Los Angeles, at which time he had quarreled with her. At that time he was working on Terminal Island, Los Angeles. He left Seattle for Alaska in May, 1944.

Alfred B. Moore was a negro soldier who had been inducted into the service from Los Angeles and had been in the army about eighteen months. He had been married to Bessie Moore about sixteen years. For about eight or ten months prior to April of 1944, Moore's detachment had been in the Aleutian islands. He had returned to the states and to Fort Lawton the latter part of March or the first part of April of 1944. Moore telephoned his wife, who resided in Los Angeles, at the time of his arrival, and she came to Seattle to see him. He obtained a furlough for nineteen days commencing April 18, 1944, and on that day Mr. and Mrs. Moore left Seattle by train for Los Angeles. On the day before, Maxine Guerzon, who had been in Seattle with her husband, Amore, left there in company with another girl to visit friends in Los Angeles. They

took the bus to Portland and there took the same train out of Portland on which were Moore and his wife.

Maxine and Moore became acquainted with each other shortly after the train got out of Portland. They exchanged notes, engaged in tete-a-tetes, and, in short, Moore's attentions to Maxine were by her encouraged to such an extent that she agreed to go out with him when they reached Los Angeles.

Maxine was in Los Angeles about ten days, during which time she had at least six dates with Moore. When she got back to Seattle, she went to her husband's hotel, stayed with him a few hours, and then moved to another place in Seattle, where Moore contacted her frequently after his return to Seattle on May 7, 1944. The acquaintanceship by this time had developed to such an extent that Maxine wanted Moore to divorce his wife for her. She stated that she "was crazy about him." On at least one occasion, she was with Moore from midnight until 10:30 a.m. the following morning, at which time she answered the phone in his room at the Mar Hotel.

Maxine's husband, Amore, and J. J. were then in Alaska, having left Seattle in May. While there, they had a conversation about Maxine; and on the day their boat docked on its return to Seattle, Maxine, who had been in Los Angeles, returned to Seattle. This was on August 20, 1944. She was accompanied by her sister, Gloria Munger Quitazol, and they came up in Maxine's 1941 Buick sedan. Maxine saw her husband, Amore, as soon as she arrived in Seattle; and then on August 21, 1944, she and her sister went to another hotel and there registered under their maiden names. She then telephoned Moore and arranged to meet him at eight o'clock p. m. at a club near 12th and Washington streets in Seattle.

Later that evening, appellant, Maxine Guerzon, while with Moore and her sister, saw J. J. in another club. There they had a brief conversation. J. J. testified that Maxine said to him, "J., I don't like that deal where you told to my husband I am nigger lover." He denied making the statement, and Maxine asked him to accompany her, a little

later on, to a place where she intended to get her husband so that J. J. could deny in her presence and before Amore, having made such a statement. Maxine then left the Merchant Marine Club, rejoined Moore, and they then crossed the street to the colored Elks' Club on Washington street. Moore testified that at that place, Maxine said to him, referring to J. J., "I don't like that so and so; I am going to kill him." She asked Moore to accompany her, and she and Moore left the Elks' Club, walked to where her car was parked (just a few steps away and across the street from the club in which Maxine had just a few minutes before left J. J.), took a .38 caliber revolver out of the glove compartment of her car, smashed the dome light over the back seat, and handed the gun to Moore, who then got into the back seat. Maxine then started the car and drove around the block to 7th and King streets; she then asked Moore to lie down on the floor of the car in the back and when he refused, let him out of the car on the corner, telling him to wait there for her.

When he got out of the car, Moore stuck the barrel of the gun under his belt and waited there for Maxine, who drove back to Washington street, picked up J. J. (who thought she was taking him to confront her husband), came back to where Moore was waiting, stopped the car, and Moore got into the back seat. Maxine then, according to Moore, told J. J. that she was "taking him for a ride— she was going to kill him." During the ride she told him to "pray," that the cigarette she told him to light was "the last cigarette you smoke," and that during all this time Moore was holding the gun against the back of J. J.'s head. Maxine finally said, "let him have it" and J. J. heard Moore "cock" the gun, twisted around in the front seat, ducked and jumped out the door as Moore fired. The bullet entered J. J.'s body a little to the front of and near the right hip bone, coursing downward and to the front, and lodged in the scrotal sac.

According to Moore, he then jumped out of the car, rejoined Maxine Guerzon, wiped the finger prints off the

window of the car, disposed of the gun, and then they came back to town and he went out to camp.

In his opening statement to the jury, the deputy prosecuting attorney said:

"The state is going to show this crime was planned and accomplished *by a white girl and her Negro paramour* to eliminate a Filipino who she believed was going to or had exposed *her illicit relationship* to her husband, Amore Guerzon." (Italics ours.)

The appellant contends that this constituted reversible error on the following grounds: First, the statement was *an attack* on the character of the accused Maxine Guerzon *in advance of her taking the witness stand* to testify in her own behalf. Second, the statement was an unfounded *charge of collateral crime,* namely: that of *adultery* (Rem. Rev. Stat., § 2547 [P.P.C. § 118-115]). Third, there was *never any evidence* of any nature introduced throughout the trial *to prove this characterization* and charge made by the deputy prosecuting attorney, and therefore these matters stated as facts, but not proven, had no causal connection, did not grow out of the same transaction, and could not have been introduced for the purpose of showing intent or design. Fourth, the *characterization* forced the defendant Guerzon *to take the witness stand* as a witness, or rest under the imputation.

Appellant relies upon *State v. O'Donnell,* 191 Wash. 511, 71 P. (2d) 571; *State v. Barton,* 198 Wash. 268, 88 P. (2d) 385; *State v. Carr,* 160 Wash. 74, 294 Pac. 1013; *State v. Sang,* 184 Wash. 444, 51 P. (2d) 414; *State v. Devlin,* 145 Wash. 44, 258 Pac. 826. We find these cases not to be in point on the facts and hence not controlling here.

■ " 'The general rule is that, when the defendant is charged with a particular crime, evidence of a collateral crime is inadmissible. This rule, however, is subject to a number of exceptions, one of which is that evidence of the collateral crime is proper for the purpose of showing motive. Before evidence of the collateral crime can be received, there must be some causal relation or natural connection between that crime and the one for which the defendant is being tried. *State v. Hakon,* 21 N. D. 133, 129

N. W. 234; *State v. Beam,* 184 N. C. 730, 115 S. E. 176. Evidence of the existence of a motive, or a lack thereof, for the commission of any particular crime is often of much importance in determining whether the defendant committed the crime with which he is charged.'" *State v. Richardson,* 197 Wash. 157, 84 P. (2d) 699.

This court said in *State v. Barton,* 198 Wash. 268, 88 P. (2d) 385:

"The exceptions to the rule that evidence of a collateral crime is inadmissible to show either guilt or that the defendant would be likely to commit the crime for which he is on trial are *motive, intent, identity, a common scheme or plan, and absence of accident or mistake.* 1 Wharton, Criminal Evidence (11th ed.), 490." (Italics ours.)

In *State v. Richardson, supra,* this court held that motive may be shown by prior relations by the deceased and the accused, even though such relations involved the commission of unlawful acts other than the crime charged; the admissibility of such evidence being left largely to the discretion of the trial judge.

See, also, *State v. Kritzer,* 21 Wn. (2d) 710, 152 P. (2d) 967. In *State v. Churchill,* 52 Wash. 210, 100 Pac. 309, this court said, quoting from *People v. Colvin,* 118 Cal. 349, 50 Pac. 539:

"To indicate the state of mind of the defendant at the time of the killing, the prosecution is always entitled to show any previous difficulties or troubles that have arisen between the parties, and this showing is not limited to physical encounters, but may consist solely in an affray of words; and this character of evidence is admissible, however much it may tend to disgrace and injure the defendant in the estimation of the jury."

There may be some question as to the conclusiveness of the evidence to prove the prosecutor's opening statement, but this is not a case where evidence in support of it would have been clearly inadmissible.

This court in *State v. Boone,* 65 Wash. 331, 118 Pac. 46, quoting with approval *People v. Gleason,* 127 Cal. 323, 59 Pac. 592, said:

"The prosecuting attorney in his opening statement to

the jury mentioned one or two facts which he said he expected to prove, but which he did not prove; and appellant contends that this was such misconduct as calls for a reversal. No objection was made to this during the trial; but, waiving the question whether the point is properly presented here, the contention cannot be maintained. It would be going a great distance to hold that every time a district attorney happens to state in his opening more than he is able to prove, the judgment should be reversed for misconduct; and there is nothing in the present case to show such an extreme disregard for the truth and such a clear intent to influence the jury by false statements as would warrant a reversal of the case upon that ground. Usually, such an overstatement is prejudicial to the party making it."

See, also, *State v. Edelstein,* 146 Wash. 221, 262 Pac. 622; *State v. Zupan,* 155 Wash. 80, 283 Pac. 671; *State v. Budreau,* 156 Wash. 103, 286 Pac. 51, 68 A. L. R. 1035; and *State v. Green,* 158 Wash. 574, 291 Pac. 728.

The prosecuting attorney's opening statement did not constitute prejudicial error.

The appellant contends that the court erred in overruling appellant's motion for a separate trial. The motion was based on the ground that the defenses of the defendants were antagonistic and that her codefendant had made a confession which would not be admissible against her but would prejudice the jury against her. This contention is controlled by *State v. Clark,* 156 Wash. 47, 286 Pac. 69, 85 A. L. R. 502, in which this court said:

"It is said, however, that the present case is distinguished from the cited cases in the fact that there is in the present case a showing of necessity for a separate trial, while in the cited cases there was not. But this fact cannot affect the rule. While the showing may aid the court in the exercise of its discretion, it neither adds to nor limits its powers. The question is still one on which the court may exercise its discretion, and if the manner of its exercise is reviewable at all, it is only so for manifest abuse.

"But, conceding that the ruling may be reviewed for the latter reason, we see nothing in the showing here made which would even indicate that a denial of a separate trial would amount to an abuse of discretion. It would be dif-

ficult to conceive of a case where two or more persons are tried for the same crime in which some one or more of the conditions pointed out will not arise, and, if they are to be regarded as requiring a separate trial, it is at once plain that the statute is rendered nugatory, and joint trials will be the exception and not rule. But such was not the intent of the legislature."

We find no manifest abuse of discretion by the court.

■ The appellant contends that the court erred in refusing to give a requested instruction containing a statement of facts in accordance with the appellant's theory of the case. Inasmuch as the court adequately covered the issues in the instructions given, such refusal was not error. See *State v. Crossman,* 189 Wash. 124, 63 P. (2d) 934; *State v. Refsnes,* 14 Wn. (2d) 569, 128 P. (2d) 773.

■ The appellant contends that, inasmuch as the information charged first-degree assault, it was error for the court to instruct on a general definition of assault and battery preliminary to instructions on assault in the first degree, in particular on the ground that it confused the jury. The contention is without merit.

The judgment is affirmed.

BEALS, C. J., BLAKE, ROBINSON, and SIMPSON, JJ., concur.