[No. 36501.    Department Two.    September 26, 1963.]

THE STATE OF WASHINGTON, *Respondent,* v. LARRY DEWAYNE
BRUBAKER, *Appellant.*\*

\*Reported in 385 P. (2d) 318.

*Sanford Clement,* for appellant.

*R. DeWitt Jones* and *Robert L. Harris,* for respondent.

HAMILTON, J.—Defendant stands charged and convicted of the crime of manslaughter. He appeals. Error is assigned to the denial of defendant's motion to dismiss at the conclusion of the state's case and to the admission of certain testimony.

Defendant and John Leake, the decedent, both about 16 years of age, were close friends and often stayed overnight together in their respective family homes.

On November 26, 1961, John Leake was staying the night with the defendant. About 9 p.m., the boys retired to defendant's bedroom where they were heard talking together. A short time later, the remaining members of the family heard a shot and, upon investigation, found John Leake on the bedroom floor with a fatal bullet wound in his head and defendant's 22-Magnum, two-chamber, Derringer type, pistol lying by his side.

The police were called. Upon questioning, defendant advised them that, after retiring to the bedroom, the boys had taken the pistol from its place in the room for the purpose of repairing it; that John Leake was despondent over a broken romance with defendant's younger sister; and that during the course of the repair work he turned away from John, heard a shot, and, upon turning back, observed him fall from the bed. Later, defendant stated to the officers that when he turned back to John he noticed him with the gun to his head and heard him make a statement relative to doing away with himself, whereupon he grasped his hand and, during the ensuing struggle, the gun discharged.

On November 28th, following further interrogation, the defendant signed a written statement to the effect that he and John had been engaged in a game analogous to "Russian Roulette." They would load one chamber of the two-chamber Derringer, making sure the cartridge was placed in the chamber which would not fire the next time

the trigger was pulled, then take turns pointing the weapon at each other's head and pulling the trigger. Defendant stated that, upon his turn to point the gun at John, the gun discharged.

At the trial, defendant testified his statement of November 28th was false and reiterated his earlier statement to the effect that John was despondent, spoke of taking his own life, held the gun to his own head, and that it discharged during the struggle following defendant's intervention. Defendant further testified that during the confusion immediately following the incident, and before his parents arrived upon the scene, he placed another cartridge in the weapon.

Police examination of the gun revealed that both chambers contained cartridges, one of which was discharged, and that the weapon bore no finger prints. Medical examination indicated the fatal bullet entered John's head about $2\frac{1}{2}$ inches above and $\frac{1}{2}$ inch posterior to the tip of the right ear, and emerged midway between the tip of the left ear and eyebrow.

Defendant assigns error to the trial court's denial of his motion to dismiss at the conclusion of the state's case in chief, contending that the evidence presented fails to establish aggravated, culpable or gross negligence upon his part.

We find no merit in this assignment of error for three reasons. First, the defendant did not stand upon his motion to dismiss, interposed at the conclusion of the state's case, but proceeded to introduce testimony on his own behalf. He thereby waived any assignment of error directed to the denial of such motion. *State v. Thomas,* 52 Wn. (2d) 255, 324 P. (2d) 821. Second, ordinary, as distinguished from aggravated or gross, negligence will support a conviction of manslaughter prosecuted under RCW 9.48.060. *State v. Hedges,* 8 Wn. (2d) 652, 113 P. (2d) 530; *State v. Ramser,* 17 Wn. (2d) 581, 136 P. (2d) 1013; *State v. Sill,* 47 Wn. (2d) 647, 289 P. (2d) 720. Third, the evidence introduced by the state, through defendant's writ-

ten statement, of his participation with John in pointing the gun at one another, coupled with physical factors adduced, *i.e.,* the absence of fingerprints upon the weapon and the angle or path of the fatal bullet, constitutes substantial evidence of the corpus delicti and ordinary negligence, if not gross negligence.

Defendant offered evidence and took the stand upon his own behalf. He did not offer or seek, in his case in chief, to introduce any evidence concerning his character or bearing upon his or John Leake's knowledge, experience, training, or care in the use of firearms. The following occurred upon cross-examination of the defendant:

"Q. And isn't it a fact that you were in the kitchen and that you had this gun in your hand and that you cocked it and pointed it at— . . . and you pointed the gun at Dale Peterman and that didn't John Leake say to you, 'Don't point that gun at me while it is loaded.' [Speaking of the evening of November 24th.] . . . A. No, I did not point no gun at anybody. Q. Well, you had some conversation about pointing the gun, didn't you, Larry? A. No, we had no conversation that day. Q. Now I am talking about Friday night in the kitchen of the Leake home? A. I know what you are talking about. Q. And you say now you didn't have the gun out and weren't pointing it at Dale Peterman? A. That is right. Q. And that John didn't say anything to you about not pointing it? A. That is right. Q. And then on Saturday morning after you got up you were also using this gun, weren't you? A. Yes. Not in the morning, we used it about noon. . . . Q. What time did you leave the Leake home? A. Oh, about seven thirty, eight. Q. And was Dale Peterman there at that time? A. I can't remember for sure. I think he was, though. Q. Well, didn't you on that occasion, Larry, again point this gun while it was loaded at Dale Peterman? A. No, I did not."

Upon conclusion of defendant's testimony, the defense rested, and the state then called witness Dale Peterman in rebuttal, who testified:

"Q. Now were you with Larry and John in the kitchen of the Leake home on Friday, November 24th? A. Yes. . . . Q. Did Larry have this gun, Exhibit 4, with him at that time? A. Yes. Q. Now I will ask you whether or not on that occasion at the Leake home on the 25th of Novem-

ber, if he took this gun, Exhibit 4, cocked it, and pointed it at your stomach? A. Yes. . . . Q. And did John Leake say anything when this happened? A. Yes. He said not to point the gun. . . . Q. Now I direct your attention to Saturday morning, November the 25th, and on that date were you with John Leake and Larry Brubaker? A. Yes. . . . Q. And did you later see Larry Brubaker with *this 22 pistol when you got back to the Leake home that day?* A. Well, he was with us. You mean that evening? Q. Yes. A. Yes. . . . Q. After you got back to the Leake home did you again see Larry with this pistol, Exhibit No. 4? A. Yes. Q. Did he on that occasion cock the pistol and point it at you? . . . A. Well, we came back that evening and we was shooting the gun. We came back into the house and there was a 22 pistol laying up on the shelf, and Larry was looking at it and he pointed it and cocked it. It was empty. Q. And then that was a different gun than this one here? A. Yes. Q. And then later on that night *did you see him with this Derringer?* A. Yes. . . . Q. Well, Dale, will you go ahead and tell whether there was anything further done in the handling of this Exhibit 4 while you were out there Saturday evening? A. You mean Saturday? Well, it was later that night before Larry and John were going back to Larry's house. We was in the bedroom and that is when Larry pointed the gun at me the second time. Q. And what did he do on that occasion when he pointed it at you? A. Well, I don't know for sure if he meant to point it at me or not, but he didn't do nothing."

Defendant, at appropriate stages during cross-examination and introduction of the recited rebuttal evidence, objected and moved for mistrial. Defendant assigns error to the overruling of his objections and to the denial of his motion for mistrial. He contends that the questioned evidence constituted an impermissible attack upon his character and credibility by proof of prior acts of misconduct.[1]

The state concedes the general rule to be as summarized in *State v. Emmanuel*, 42 Wn. (2d) 1, 13, 253 P. (2d) 386:

"With regard to impeachment, it is provided by statute that a prior conviction may be shown for the purpose of affecting the weight of a witness' testimony. RCW 5.60.040 (Rem. Rev. Stat., § 1212); RCW 10.52.030 (Rem. Rev. Stat.,

[1]The aiming of a gun, loaded or unloaded, at another person constitutes a misdemeanor. RCW 9.41.230.

§ 2290); *State v. Arnold*, 130 Wash. 370, 227 Pac. 505. But a witness may not be impeached by showing specific acts of misconduct. *State v. Belknap*, 44 Wash. 605, 87 Pac. 934; *State v. Arnold, supra; Warren v. Hynes*, 4 Wn. (2d) 128, 102 P. (2d) 691. This is true whether the impeachment is attempted by means of extrinsic evidence or cross-examination. *State v. Belknap, supra; Warren v. Hynes, supra.* It is likewise true whether or not the past act of misconduct actually amounts to a crime. *State v. Belknap, supra.* Our court has said that if these rules of exclusion are not respected, the defendant is denied a fair and impartial trial. *State v. Belknap, supra; State v. Devlin*, 145 Wash. 44, 258 Pac. 826."

See, also 1 Wigmore on Evidence (3d ed.) § 196, p. 666.

The state, however, contends the evidence of prior or similar acts of misconduct to be admissible under the rule as pronounced in *State v. Goebel*, 40 Wn. (2d) 18, 21, 240 P. (2d) 251, wherein we stated:

"The rule . . . is that a defendant must be tried for the offenses charged in the indictment or information, and that evidence of unrelated crimes may not be admitted. . . . certain exceptions to this rule of exclusion have developed. These exceptions are to show (1) motive, (2) intent, (3) the absence of accident or mistake, (4) a common scheme or plan, or (5) identity. This list of exceptions is not necessarily exclusive, the true test being whether the evidence as to other offenses is relevant and necessary to prove an essential ingredient of the crime charged. *State v. Lew*, 26 Wn. (2d) 394, 174 P. (2d) 291."

The initial vice in the state's argument is that it did not, in the trial court, offer the evidence in question upon any of the grounds now urged. Rather, in the presence of the jury, the state urged admissibility of the evidence upon the premise that the defendant had introduced evidence of his experience and care in the handling of firearms (a premise not supported by the record before us) and for impeachment purposes. No limiting or cautionary instruction was given relative to the jury's consideration of the evidence. The jury, on the other hand, was instructed that if it found any witness had testified falsely as to any material matter it was at liberty to disregard the testimony of

such witness. So far, then, as the jury was concerned, it was entitled to conclude from the evidence in question that the defendant had a propensity or disposition for pointing loaded firearms at others and that he had testified falsely. Under similar circumstances we reversed a conviction in *State v. Goebel,* 36 Wn. (2d) 367, 378, 218 P. (2d) 300, and stated:

" . . . The state will not be permitted to secure the admission of evidence of another, unrelated crime for the purpose of impeachment, as it did here, when it is not admissible for that purpose, and then justify its admission on other and proper grounds, suggested for the first time in the appellate court. . . .

" . . . When it becomes apparent that certain evidence tends to prove an independent and unrelated offense, the trial judge, in the absence of the jury, should ascertain upon what basis of relevancy the state relies. If the evidence offered is shown to be relevant to any material issue before the jury, it *may* be admitted, and, if it is, an explanation should be made at the time to the jury of the purpose for which it is admitted. . . . and it should also be the court's duty to give the cautionary instruction that such evidence is to be considered for no other purpose or purposes."

A more fundamental vice, however, lies in the state's argument. That is the relevancy of the questioned evidence. If its only relevancy be for the purpose of demonstrating the defendant's character or propensity for careless handling of firearms, then the evidence was erroneously admitted. *State v. Barton,* 198 Wash. 268, 88 P. (2d) 385; *State v. Lapage,* 57 N. H. 245, 24 Am. Rep. 69. As stated in 1 Wigmore on Evidence (3d ed.) § 192, p. 642:

"This principle has long been accepted in our law. That 'the doing of one act is in itself no evidence that the same or a like act was again done by the same person', has been so often judicially repeated that it is a commonplace: . . ."

As indicated, the state urges that the questioned evidence is relevant to one or more of the issues referred to in *State v. Goebel, supra,* that is, intent, motive, common scheme or

plan, identity, or the absence of accident or mistake. The state suggests no other issues.

■■ Criminal intent is not an element of the crime of manslaughter under RCW 9.48.060. *State v. Sandvig,* 141 Wash. 542, 251 Pac. 887; *State v. Hopkins,* 147 Wash. 198, 265 Pac. 481, 59 A. L. R. 688. Neither is intent essential to proof of ordinary negligence. *Adkisson v. Seattle,* 42 Wn. (2d) 676, 258 P. (2d) 461. And, negligent conduct upon a particular occasion cannot ordinarily be shown by previous acts of negligence. *Brooks v. Herd,* 144 Wash. 173, 257 Pac. 238; 1 Wigmore on Evidence (3d ed.) § 199, p. 677. Motive, common scheme or plan and identity were not here in issue.

■ The presence or absence of accident or mistake was not a disputed issue in the usual sense. The state did not contend the defendant wilfully or purposely shot John Leake. The basis of the state's case was that the defendant unintentionally and inadvertently or accidentally shot him while negligently pointing the pistol, whether during a game of "Russian Roulette" or otherwise. The defendant's evidence sought to excuse the unfortunate event upon the premise that it occurred inadvertently or accidentally in the course of a struggle to prevent a suicide attempt. Both theories tacitly admit accident or mistake. If there be a peg of relevancy upon which to hang the questioned evidence, upon the basis that it tends to negative accident or mistake, the peg is so elusive as to be wholly obscured by the impact of the evidence upon the defendant's character or disposition. The natural but excluded reasoning inevitably induced by the questioned evidence is: *the defendant negligently pointed the gun at John, or engaged with him in a game of "Russian Roulette", because he negligently pointed the gun at a third person during the preceding two days.* As pointed out in 1 Wigmore on Evidence (3d ed.) § 194, p. 646:

"It may almost be said that it is because of this indubitable Relevancy of such evidence that it is excluded. It is objectionable, not because it has no appreciable probative value, but because it has too much. The natural and

inevitable tendency of the tribunal—whether judge or jury —is to give excessive weight to the vicious record of crime thus exhibited, and either to allow it to bear too strongly on the present charge, or to take the proof of it as justifying a condemnation irrespective of guilt of the present charge. . . ."

We conclude that the evidence in question was erroneously and prejudicially admitted.

The judgment of conviction is reversed, and the defendant granted a new trial.

OTT, C. J., DONWORTH, FINLEY, and WEAVER, JJ., concur.

\*Reported in 385 P. (2d) 312.